# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-30918

United States Court of Appeals
Fifth Circuit

**FILED**

April 8, 2015

Lyle W. Cayce
Clerk

NOLA SPICE DESIGNS, L.L.C.,

      Plaintiff - Appellee

v.

HAYDEL ENTERPRISES, INCORPORATED, doing business as Haydel's Bakery,

      Defendant - Third Party Plaintiff - Appellant

RAQUEL DUARTE,

      Third Party Defendant - Appellee

Appeals from the United States District Court
for the Eastern District of Louisiana

Before KING, GRAVES, and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

This case concerns the intersection between intellectual property rights and a Mardi Gras tradition. Haydel Enterprises appeals the district court's grant of summary judgment to Nola Spice Designs and Raquel Duarte on

No. 13-30918

claims of trademark infringement, unfair competition, trademark dilution, copyright infringement, and unfair trade practices. We affirm.

## FACTS AND PROCEEDINGS

During Mardi Gras parades in New Orleans, parade "krewes" throw strands of plastic beads to onlookers, who, in turn, have created "bead dogs" by twisting these strands into the shape of a dog. Haydel Enterprises ("Haydel") owns Haydel's Bakery in New Orleans, which makes and sells pastries and cakes, including its popular king cake sold during the Mardi Gras season. In 2008, Haydel commissioned an artist to design a mascot, which was named "Mardi Gras Bead Dog." On October 13, 2009, and December 1, 2009, the United States Patent and Trademark Office ("PTO") issued two trademark registrations to Haydel for, respectively, the phrase "MARDI GRAS BEAD DOG" and its bead dog design. The design consists of a "stylized dog wearing a beaded necklace, with the dog being formed by a series of spheres designed to look like Mardi Gras style beads. The dog has two eyes and a nose, all formed by smaller beads." Both registrations cover king cake pastries, jewelry, and clothing (shirts, hats, and baby jumpsuits). Haydel sells these items in its New Orleans store, online, and through its licensee Fleurty Girl, a New Orleans retailer. In September 2012, Haydel obtained a certificate of copyright registration for its work titled "Bead Dog" in "photograph(s), jewelry design, 2-D artwork, sculpture." Haydel has acknowledged that its mascot "brings to mind the traditional bead dog" made of Mardi Gras beads. Nevertheless, Haydel asserts that its mascot and its use of the phrase "Mardi Gras Bead Dog" differ from the Mardi Gras tradition in key respects, which we will discuss.

In May 2012, Raquel Duarte formed Nola Spice Designs, which sells jewelry and accessories, including necklaces and earrings featuring bead dog trinkets. Duarte twists each bead dog by hand from beads and wire, following

2

the same general method that she used to make bead dogs as a child during Mardi Gras. By contrast, the bead dogs in Haydel's jewelry are made of sterling silver. Duarte sells her jewelry on the Internet under titles that include the phrase "bead dog," but not "Mardi Gras bead dog." The appendix to this opinion contains images of Haydel's bead dog sculpture, jewelry, and trademarked design, as well as images of Nola Spice's jewelry and of a traditional bead dog trinket.

Haydel learned of Duarte's bead dogs through Haydel's customers. In August 2012, Haydel sent Nola Spice Designs a letter noting Haydel's trademark and copyright in "the bead dog design," and demanding, *inter alia*, that Nola Spice Designs "remove from [its] website all display, mention of or reference to the bead dog design," and "cease any and all promotion, sale, and/or use" of materials incorporating the bead dog design. In October 2012, Nola Spice Designs filed a complaint against Haydel seeking (1) a declaratory judgment that Nola Spice Designs's activities do not violate the Lanham Act, 15 U.S.C. § 1051 *et seq.*, or any other trademark law; (2) the cancellation of Haydel's trademarks under 15 U.S.C. § 1119; and (3) damages for unfair trade practices under the Louisiana Unfair Trade Practices Act ("LUTPA"), La. Rev. Stat. Ann. § 51:1401 *et seq.* Haydel asserted counterclaims against Nola Spice Designs and filed a third-party complaint against Duarte, seeking injunctive relief and damages. Specifically, Haydel asserted counterclaims for trademark infringement, unfair competition, and trademark dilution, all in violation of the Lanham Act, unfair trade practices under LUTPA, and copyright infringement in violation of the Copyright Act, 17 U.S.C. § 101 *et seq.* The parties also filed cross-motions for summary judgment.

On August 28, 2013, the district court granted in part and denied in part the motion for summary judgment filed by Nola Spice Designs and Duarte

3

(collectively, "Nola Spice") and denied Haydel's motion for summary judgment. Specifically, the district court granted summary judgment to Nola Spice on its claim for a declaratory judgment that it was not infringing Haydel's trademarks, and the court cancelled those trademarks as unprotectable, but it denied Nola Spice's motion for summary judgment on its LUTPA claims. The district court also granted summary judgment to Nola Spice on Haydel's claims of trademark infringement, unfair competition, trademark dilution, copyright infringement, and unfair trade practices. Haydel timely appealed the district court's August 28 order. Nola Spice did not appeal the district court's dismissal with prejudice of its LUTPA claim.

## STANDARD OF REVIEW

We review *de novo* a district court's grant of summary judgment, *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 226 (5th Cir. 2009), applying the same standard as the district court, *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 507 (5th Cir. 2003). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when the "'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party "'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'" *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014) (alteration in original) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the moving party fulfills this responsibility, the non-moving party must "go beyond the

pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* (quoting *Celotex Corp.*, 477 U.S. at 324) (internal quotation marks omitted). Where the non-movant bears the burden of proof at trial, "the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718–19 (5th Cir. 1995) (per curiam). In reviewing a grant of summary judgment, we view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *United States ex rel. Taylor-Vick v. Smith*, 513 F.3d 228, 230 (5th Cir. 2008). We may affirm a grant of summary judgment "based on any rationale presented to the district court for consideration and supported by facts uncontroverted in the summary judgment record." *Terrebonne Parish Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 887 (5th Cir. 2002).

## DISCUSSION

### I.    Trademark Infringement

Trademark infringement claims are governed by the Lanham Act, 15 U.S.C. § 1051 *et seq.* That Act defines "trademark," in relevant part, as:

> any word, name, symbol, or device, or any combination thereof . . . used by a person . . . to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown.

15 U.S.C. § 1127. To prevail on its claim of trademark infringement under the Lanham Act, Haydel must show (1) it possesses valid trademarks; and (2) Nola Spice's use of Haydel's trademarks creates a likelihood of confusion as to

source, affiliation, or sponsorship. *Nat'l Bus. Forms & Printing, Inc. v. Ford Motor Co.*, 671 F.3d 526, 532 (5th Cir. 2012); 15 U.S.C. § 1114(1). The district court granted summary judgment to Nola Spice on Haydel's claim of trademark infringement and entered a declaratory judgment of non-infringement on the ground that Haydel's marks are not legally protectable. The court pretermitted discussion of likelihood of confusion.

To be legally protectable, a mark must be "distinctive" in one of two ways. *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir. 2008).

> First, a mark is inherently distinctive if its intrinsic nature serves to identify a particular source. . . . Second, a mark has acquired distinctiveness, even if it is not inherently distinctive, if it has developed secondary meaning, which occurs when, in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself.

*Wal–Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 210–11 (2000) (internal quotation marks, citations, and alterations omitted). The registration of Haydel's marks with the PTO is prima facie evidence that the marks are inherently distinctive. *See Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 237 (5th Cir. 2010); 15 U.S.C. § 1057(b) (registration of a mark on the principal register is prima facie evidence of the mark's validity).[1] However, Nola Spice may rebut this presumption by demonstrating that the marks are not inherently distinctive. *Amazing Spaces*, 608 F.3d at 237. The analysis that our circuit follows to determine whether a mark is inherently distinctive differs

---

[1] Haydel asserts, and Nola Spice does not dispute, that the PTO registered Haydel's marks based on a finding of inherent distinctiveness, and not a finding of acquired distinctiveness. Indeed, there is no evidence in the record that the PTO examined evidence of secondary meaning. We therefore presume inherent distinctiveness. *See 2 McCarthy on Trademarks and Unfair Competition* § 11:43 (4th ed.) [hereinafter *McCarthy on Trademarks*] ("[W]hen the USPTO registers a mark without requiring evidence of secondary meaning ('acquired distinctiveness'), it is presumed to be inherently distinctive.").

for word marks and design marks. *Id.* at 243. Therefore, we analyze separately the distinctiveness of Haydel's word mark ("Mardi Gras Bead Dog") and the distinctiveness of its design mark (the bead dog design).

**A. Word Mark**

To assess the distinctiveness of a word mark, our circuit relies on the spectrum set forth by Judge Friendly in *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir. 1976). *Abercrombie* divided marks into five categories: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful. *Id.*[2] While suggestive, arbitrary, and fanciful marks are inherently distinctive, generic marks cannot be distinctive, and descriptive marks are distinctive only if they have acquired "secondary meaning." *Sugar Busters LLC v. Brennan,* 177 F.3d 258, 268 (5th Cir. 1999). In categorizing a term, we must examine the context in which the term is used. *Union Nat'l Bank of Tex., Laredo, Tex. v. Union Nat'l Bank of Tex., Austin, Tex.*, 909 F.2d 839, 847 (5th Cir. 1990). We consider "how [the term] is used with other words," "the products or services to which it is applied," and "the *audience* to which the relevant product or service is directed." *Id.* "[T]he question is, 'What do the buyers understand by the word for whose use the parties are contending?'" *Id.* (quoting *Bayer Co. v. United Drug Co.*, 272 F. 505, 509 (S.D.N.Y. 1921) (Hand, J.)). Although "summary judgment is rarely appropriate" on the factual question of categorization, *Xtreme Lashes, LLC*, 576 F.3d at 232, we may affirm a grant of summary judgment where the "'record compels the conclusion that the movant is entitled to judgment as a matter of law.'" *Amazing Spaces*, 608

---

[2] The Third Circuit has provided concise examples of what constitutes each type of mark: "(1) arbitrary or fanciful (such as 'KODAK'); (2) suggestive (such as 'COPPERTONE'); (3) descriptive (such as 'SECURITY CENTER'); and (4) generic (such as 'DIET CHOCOLATE FUDGE SODA')." *Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 472 (3d Cir. 2005) (internal quotation marks and citation omitted).

F.3d at 234 (quoting *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.* (*Smack Apparel*), 550 F.3d 465, 474 (5th Cir. 2008)). The district court found, and Nola Spice argues on appeal, that "Mardi Gras Bead Dog" is not entitled to trademark protection because it is generic, or alternatively, because it is descriptive and has not acquired secondary meaning. Haydel argues that "Mardi Gras Bead Dog" is suggestive as applied to its jewelry and arbitrary as applied to its clothing and king cakes.

"A *generic* term is the name of a particular genus or class of which an individual article or service is but a member." *Amazing Spaces*, 608 F.3d at 241 (citation omitted); *see also Schwan's IP, LLC v. Kraft Pizza Co.*, 460 F.3d 971, 974 (8th Cir. 2006) ("A generic term . . . refers to the common name or nature of the article."). "The test for genericness is whether the public perceives the term primarily as the designation of the article." *Soc'y of Fin. Exam'rs v. Nat'l Ass'n of Certified Fraud Exam'rs Inc.*, 41 F.3d 223, 227 (5th Cir. 1995) (internal quotation marks, citation, and alterations omitted).

The record evidence, read in the light most favorable to Haydel, demonstrates that the term "Mardi Gras Bead Dog" refers to the figure of a dog made from Mardi Gras beads. David Haydel, Jr., testified that "[b]ead dog, beaded dog, a dog made of beads are all common terms for describing" a dog made from Mardi Gras-style beads. Dawn Turner, a Louisiana resident, submitted an affidavit stating that she has "childhood memories of making handmade bead dogs from broken Mardi Gras beads." Similarly, Mary-Clare Manson stated in an affidavit that at Mardi Gras parades, her daughter learned from other children "how to twist the broken beads into the shape of a dog, which we have called bead dogs for many years." Although these trinkets are sometimes described as "bead dogs" and not "Mardi Gras bead dogs," Philip Weddle, the artist who created Haydel's bead dog design, agreed at his

8

deposition that the terms "Mardi Gras" and "bead dog" "naturally go together:" "You know, it's a bead dog. It's kind of hard . . . not [to] put them together, Mardi Gras." Indeed, the Copyright Office, in response to Haydel's application for a copyright registration in its bead dog design, noted that "Mardi Gras bead dogs . . . have apparently become well-known and traditional parts of Mardi Gras." The record evidence thus makes clear that the relevant public—those familiar with Mardi Gras traditions—perceives the term "Mardi Gras bead dog" primarily to refer to a dog made of Mardi Gras beads. However, Haydel does not sell dogs made of Mardi Gras beads. Rather, Haydel sells silver jewelry in the shape of bead dogs, clothing with the image of a bead dog, and king cakes containing or accompanied by bead dog figurines.[3] On this record, therefore, the term "Mardi Gras Bead Dog" describes a characteristic of Haydel's products, and not the products themselves. Nola Spice therefore has not carried its burden at summary judgment of demonstrating that "Mardi Gras Bead Dog" is generic as applied to Haydel's jewelry, clothing, and king cake.

The district court nevertheless properly classified Haydel's mark as descriptive. "A *descriptive* term identifies a characteristic or quality of an article or service, such as its color, odor, function, dimensions, or ingredients." *Amazing Spaces*, 608 F.3d at 241 (citation omitted). "Examples of descriptive marks would include Alo with reference to products containing gel of the aloe vera plant and Vision Center in reference to a business offering optical goods and services." *Id.* We have noted that "the concept of descriptiveness must be

---

[3] Haydel's lawyer stated to the district court that Haydel "[p]ut a bead dog [made of metal or ceramic] in a king cake with a ribbon, which is called a pull." In addition, David Haydel, Sr. stated in an affidavit that Haydel baked a record-sized king cake on September 22, 2010, and that "[e]very box with a king cake piece that was sold on [that day] contained a small statue of Haydel's MARDI GRAS BEAD DOG mascot."

construed rather broadly." *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 792 (5th Cir. 1983) (internal quotation marks, alteration, and citation omitted), *abrogated on other grounds by KP Permanent Make–Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004). A central inquiry to assess descriptiveness is the "imagination test," which "seeks to measure the relationship between the actual words of the mark and the product to which they are applied." *Id.* "If a word requires imagination to apply it to the product or service in question, it tends to show that the term as used is suggestive. On the other hand, if the word conveys information about the product, it is descriptive." *Union Nat'l Bank of Tex.*, 909 F.2d at 848.

The record makes clear that the phrase "Mardi Gras Bead Dog" conveys information about Haydel's clothing, jewelry, and king cake. The bead dog design embodied in each of these products is, in Haydel's words, a "rendering of the old time bead dog." In addition, Haydel's own public statements closely link these products to the traditional Mardi Gras bead dog. Haydel advertises its clothing on its website as "Mardi Gras Bead Dog parade gear," next to a description of the Mardi Gras tradition of twisting beads into the shape of a dog. Likewise, Haydel advertises its jewelry as a way to "[s]how your Mardi Gras spirit year round." Fleurty Girl, which sells Haydel's jewelry pursuant to a license, published the following advertisement: "In New Orleans, you can twist your Mardi Gras beads a certain number of ways and make what we call a Bead Dog. Now available for the first time ever in sterling silver." These statements make clear that the bead dog image is a central aspect of Haydel's clothing and jewelry. Similarly, the use of "Mardi Gras bead dog" in connection with king cake, a popular Mardi Gras tradition, conveys information about the bead dog figurine inside or accompanying the king cake. No reasonable juror

10

could find that imagination is required to link Haydel's clothing, jewelry, and king cake to the phrase "Mardi Gras bead dog," as Haydel uses that phrase.

A second test to determine descriptiveness is "whether competitors would be likely to need the terms used in the trademark in describing their products." *Zatarains*, 698 F.2d at 793 (internal quotation marks and citation omitted). An article in a magazine published by Haydel describes the traditional bead dog as "a fond memory of Mardi Gras' past and symbol of the City's youth." Another magazine article refers to the traditional bead dog as "an iconic Mardi Gras symbol." Given the bead dog's popularity and its close connection to Mardi Gras, common sense indicates that other vendors would need to use the term "Mardi Gras bead dog" to describe their own Mardi Gras-themed clothing, accessories, and baked goods containing the image of a bead dog. *See id.* ("Common sense indicates that in this case merchants other than Zatarain's might find the term 'fish fry' useful in describing their own particular batter mixes.")

In response to compelling evidence of descriptiveness, Haydel fails to identify evidence raising a genuine factual issue as to the word mark's inherent distinctiveness. Haydel argues that its word mark must be suggestive as applied to jewelry because Nola Spice conceded in its motion for summary judgment that "Haydel does not make and sell bead dogs." However, that statement at most reflects that the phrase "Mardi Gras bead dog" is not *generic* as applied to Haydel's merchandise. Indeed, other phrases conveying a product's shape have been found to be descriptive. *See Vox Amplification Ltd. v. Meussdorffer,* No. 13-4922, 2014 WL 558866, at *6 (E.D.N.Y. Feb. 11, 2014) ("'Teardrop[,]' . . . used in conjunction with a teardrop-shaped instrument body, is clearly descriptive."), *adopted*, – F. Supp. 3d –, 2014 WL 4829578 (E.D.N.Y. 2014); *In re Carlson Dolls Co.*, 31 U.S.P.Q. 2d 1319, at *2 (T.T.A.B. 1994)

11

(finding that the name "Martha Washington" is descriptive of a doll intended to represent the historical figure Martha Washington).

Also unpersuasive is Haydel's argument that its word mark is arbitrary as applied to clothing and king cake. Arbitrary marks "bear no relationship to the products or services to which they are applied." *Amazing Spaces*, 608 F.3d at 241 (citation omitted); *see also Union Nat'l Bank of Tex.*, 909 F.2d at 845 ("[T]he term 'arbitrary' refers to ordinary words which do not suggest or describe the services involved."). Haydel notes that "Apple" is commonly described as an arbitrary mark in connection with computers, even though an Apple computer displays the image of an apple. *See Sport Supply Grp., Inc. v. Columbia Cas. Co.*, 335 F.3d 453, 460 n.7 (5th Cir. 2003). However, a mark's categorization under the *Abercrombie* typology depends on the context in which it appears and on the nature of the products sold. *See Union Nat'l Bank of Tex.*, 909 F.2d at 847. Apple Computer sells electronic products, which bear no relationship to the fruit. By contrast, Haydel's public statements make clear that it is marketing Mardi Gras-related merchandise; the bead dog image on its clothing and the bead dog figurine inside or accompanying its king cake are part of and describe the product being sold. No reasonable juror could therefore conclude that the phrase "Mardi Gras bead dog" "bear[s] no relationship" to Haydel's clothing and king cake. *Amazing Spaces*, 608 F.3d at 241 (citation omitted). Because the record compels the conclusion that Haydel's word mark is descriptive as applied to jewelry, clothing, and king cake, the mark is legally protectable as a source identifier only if it has acquired secondary meaning, which we discuss below.

**B. Design Mark**

We now analyze the distinctiveness of Haydel's design mark, which the PTO defined as "a stylized dog wearing a beaded necklace, with the dog being

formed by a series of spheres designed to look like Mardi Gras style beads. The dog has two eyes and a nose, all formed by smaller beads."

While the *Abercrombie* test determines the inherent distinctiveness of word marks, we recently embraced the *Seabrook Foods* test to determine the inherent distinctiveness of a design mark, although we did not "go so far as to hold that the *Abercrombie* test is eclipsed every time a mark other than a word is at issue." *Amazing Spaces*, 608 F.3d at 243. To assess inherent distinctiveness, the *Seabrook Foods* test asks:

> [1] whether it was a "common" basic shape or design, [2] whether it was unique or unusual in a particular field, [3] whether it was a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods, or [4] whether it was capable of creating a commercial impression distinct from the accompanying words.

*Id.* at 232 (quoting *Seabrook Foods, Inc. v. Bar-Well Foods Ltd.*, 568 F.2d 1342, 1344 (C.C.P.A. 1977)).[4] We have noted that "[t]he first three of the *Seabrook Foods* 'questions are merely different ways to ask whether the design, shape or combination of elements is so unique, unusual or unexpected in this market that one can assume without proof that it will automatically be perceived by customers as an indicator of origin—a trademark.'" *Id.* at 243–44 (internal quotation marks omitted) (quoting *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 40 (1st Cir. 1998) (quoting 1 *McCarthy on Trademarks* § 8:13)). If not,

---

[4] This case does not require analysis of the fourth question in the *Seabrook Foods* test, which "by its terms applies only when a party seeks trademark protection for a background design typically accompanied by words." *Amazing Spaces*, 608 F.3d at 243 n.14. We further note that Nola Spice, in relying on the *Seabrook Foods* test, does not argue that the bead dog design in Haydel's products is incapable of inherent distinctiveness as "product design" trade dress. *See Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 207 (2000) (analyzing a claim of infringement of unregistered trade dress).

then the mark is not inherently distinctive and is protectable only upon a showing of secondary meaning. *Id.* at 247. We have also found useful the following language from the Restatement: "The manner in which a symbol or design is used . . . is relevant to the likelihood that it will be perceived as an indication of source. In some instances a design is likely to be viewed as mere ornamentation rather than as a symbol of identification." *Restatement (Third) of Unfair Competition* § 13 cmt. d; *Amazing Spaces*, 608 F.3d at 246; *see also* 1 *McCarthy on Trademarks* § 3:3 ("Usually, if when viewed in context, it is not immediately obvious that a certain designation is being used as an indication of origin, then it probably is not. In that case, it is not a trademark.").

We measure the distinctiveness of a design mark with reference to the market in which the mark is used, although uses beyond that market are also relevant. *See Amazing Spaces*, 608 F.3d at 245 n.18 (framing the inquiry as whether the design mark "identifies and distinguishes Amazing Spaces's self-storage services from others' self-storage services," while noting that "[t]his does not mean . . . that we must blind ourselves to uses beyond the self-storage services industry"). In evaluating distinctiveness, our circuit and other courts have considered evidence of third-party use of similar marks. *See id.* at 232 (noting that "the same or a similar five-pointed star was used in commerce in at least 63 different industries and businesses on buildings, property, and as part of logos and on the buildings of at least 28 other self-storage locations" (internal quotation marks and citation omitted)); *see also Seabrook Foods*, 568 F.2d at 1345 (noting "evidence of third-party uses and registrations of similar marks on frozen foods, indicating that Seabrook's 'oval' design is not unique in this field"); *Wiley v. Am. Greetings Corp.*, 762 F.2d 139, 142 (1st Cir. 1985) (applying *Seabrook Foods* and affirming a grant of summary judgment on a common law trademark claim on the ground that the mark—a red heart affixed

14

to the left breast of a teddy bear—was not inherently distinctive, noting that "[t]he record contains pictures of, and references to, an abundance of plush animals, including many teddy bears, that sport heart designs on their chests or other parts of their anatomy").

To prevail on summary judgment, Nola Spice must offer sufficient evidence both to overcome the presumption of inherent distinctiveness that accompanies Haydel's registration, and to compel the conclusion that Haydel's design mark is not inherently distinctive as a matter of law. *See Amazing Spaces*, 608 F.3d at 234. A first step is to define the relevant market. Haydel defines the relevant market as one for pastries, clothing, and jewelry, while Nola Spice argues that the market is one for "bead dogs." We believe the market is appropriately defined as one for Mardi Gras-themed products. This definition is consistent with advertising of Haydel's products, which makes clear that Haydel is selling Mardi Gras-themed merchandise to an audience familiar with Mardi Gras traditions. *See generally A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 303 (3d Cir. 1986) (recognizing the importance of consumer understanding to determining the relevant product genus). Haydel describes its clothing as "Mardi Gras Bead Dog parade gear." Haydel's jewelry is advertised as a traditional bead dog cast in sterling silver, and as a way to "[s]how your Mardi Gras spirit year round." As Haydel acknowledges, king cake is also a Mardi Gras tradition. We therefore must consider whether Haydel's bead dog design is "so unique, unusual or unexpected" in the market for Mardi Gras-themed merchandise that it "will automatically be perceived by customers as an indicator of origin." *Amazing Spaces*, 608 F.3d at 243–44. We may also consider uses of bead dog designs beyond that market, given that a "[c]ommonplace . . . design['s] . . . appearance on numerous products makes it unlikely that consumers will view [it] as distinctive of the goods or services

15

of a particular seller." *Restatement (Third) of Unfair Competition* § 13 cmt. d; *Amazing Spaces*, 608 F.3d at 245 n.18.

The record is replete with evidence that Haydel's design is substantially similar to the traditional bead dog that parade-goers have long crafted from Mardi Gras beads. Haydel describes its design mark as "a rendering of the old time bead dog, jazzed up for the 21st century." In its application for a copyright registration for its bead dog design, Haydel acknowledged that the image "brings to mind the traditional bead dog." Indeed, David Haydel, Jr. testified that every bead dog that could be made would "look like" Haydel's trademarked design. Ryan Haydel likewise testified that there was not "any other way to make a bead dog" besides Haydel's bead dog design. An article published in the magazine Rally to Rescue describes Haydel's design mark as taking "the form of an iconic Mardi Gras symbol: the bead dog." In addition to these statements, the record contains various images of traditional bead dogs that are similar to Haydel's design. These include a photograph of a bead dog trinket on an artist's weblog; a photograph of a bead dog crafted by Duarte from Mardi Gras-style beads during her deposition, which Haydel acknowledges is a traditional bead dog trinket; and still shots from a YouTube.com video, titled Boudreaux the BeadDog, featuring a cartoon bead dog.

Haydel argues that its design is distinct from a traditional bead dog because its design has eyes, a nose, a tail, and a necklace. However, the cartoon in Boudreaux the BeadDog also has eyes, a nose and a tail. Other images in the record depict dog trinkets made of beads and wearing a "necklace," which may be described as a collar. At most, the eyes, nose, tail, and collar on Haydel's design are a mere "refinement" of the traditional bead dog, which is a well-known image to those who celebrate Mardi Gras. *See Wiley*, 762 F.2d at 142 ("The fact that Wiley's alleged mark is a *red* heart, *permanently* affixed to the

*left* breast of a *teddy bear* does not . . . serve to distinguish [plaintiff's] use of the design from others' uses of hearts on other stuffed animals. These characteristics, even if they in combination could be deemed unique, are 'mere refinement[s] of a commonly-adopted and well-known form of ornamentation . . . .'" (emphasis in original) (quoting *Seabrook Foods*, 568 F.2d at 1344)). Given the similarity between Haydel's design mark and a traditional Mardi Gras bead dog, no reasonable juror could conclude that Haydel's mark is "so unique, unusual or unexpected" when used in connection with Mardi Gras-themed merchandise that it would "automatically be perceived by customers as an indicator of origin." *Amazing Spaces*, 608 F.3d at 243–44. Hence, Haydel's design mark, like its word mark, is not inherently distinctive and may be protected only if it has acquired secondary meaning.

### C.    Secondary Meaning

"Secondary meaning occurs when, in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself." *Id.* at 247 (internal quotation marks and citations omitted). In other words, "[t]he mark must denote to the consumer a single thing coming from a single source to support a finding of secondary meaning." *Zatarains,* 698 F.2d at 795 (internal quotation marks and citation omitted). The district court found that even if Haydel's word and design marks were descriptive and not generic, there was no factual issue as to whether these marks had acquired secondary meaning.

Because Nola Spice has demonstrated that Haydel's marks are descriptive, rebutting the presumption of inherent distinctiveness arising from Haydel's registrations, Haydel bears the burden of establishing secondary meaning at trial. *See Test Masters Educ. Servs., Inc. v. Singh,* 428 F.3d 559, 567 (5th Cir. 2005) ("Registration is *prima facie* proof that the registered mark

is distinctive. However, this presumption can be overcome by showing that the mark is merely descriptive. The burden then shifts to the registrant to prove that its mark has secondary meaning." (citations omitted)); *American Heritage Life Insurance Company v. Heritage Life Insurance Company*, 494 F.2d 3, 12 n.9 (5th Cir. 1974) (noting that where the mark was descriptive at most, but registration appeared to have been based on a finding of arbitrariness, the burden of showing secondary meaning rested with the putative mark holder), *abrogated on other grounds by B & B Hardware, Inc. v. Hargis Indus., Inc.*, No. 13-352, – S. Ct. –, 2015 WL 1291915 (2015); *20th Century Wear, Inc. v. Sanmark-Stardust Inc.*, 747 F.2d 81, 88 n.8 (2d Cir. 1984) ("We hold . . . that in the absence of evidence that the Patent and Trademark Office registered the mark because of its secondary meaning, 15 U.S.C. § 1052(f), registration does not shift the burden of proving a lack of secondary meaning onto the defendant."). In the summary judgment context, Nola Spice may merely point to an absence of evidence of secondary meaning, thus shifting to Haydel the burden of demonstrating by competent summary judgment proof that there is a genuine issue of fact warranting trial. *See Transamerica Ins. Co.*, 66 F.3d at 718–19.

The burden of demonstrating secondary meaning "is substantial and requires a high degree of proof." *Test Masters Educ. Servs.*, 428 F.3d at 567. The determination of secondary meaning is "primarily an empirical inquiry," informed by the following factors:

> (1) length and manner of use of the mark or trade dress, (2) volume of sales, (3) amount and manner of advertising, (4) nature of use of the mark or trade dress in newspapers and magazines, (5) consumer-survey evidence, (6) direct consumer testimony, and (7) the defendant's intent in copying the trade dress [or mark].

No. 13-30918

*Amazing Spaces*, 608 F.3d at 248 (internal quotation marks and citation omitted). "While none of these factors alone will prove secondary meaning, in combination they may establish the necessary link in the minds of consumers between a product and its source." *Zatarains*, 698 F.2d at 795. Although secondary meaning is a question of fact, summary judgment may be upheld if the record "compels the conclusion that the movant is entitled to judgment as a matter of law." *Smack Apparel*, 550 F.3d at 474; *Amazing Spaces*, 608 F.3d at 248–50 (affirming grant of summary judgment where plaintiff failed to raise a genuine issue of fact on secondary meaning).

As to the first factor for assessing secondary meaning, Haydel began using its marks in October 2008, when it placed a statue of its mascot in front of its bakery, three-and-a-half years before Nola Spice began selling bead dog jewelry. Haydel began using its marks in connection with the sale of jewelry, clothing, and king cake in April 2009. This duration of use is relatively brief and does not alone raise a factual issue for trial with respect to secondary meaning. *See Amazing Spaces*, 608 F.3d at 248 (finding an absence of secondary meaning, as a matter of law, where the mark was used for ten years); *Bank of Tex. v. Commerce Sw., Inc.*, 741 F.2d 785, 788 (5th Cir. 1984) (finding an absence of secondary meaning despite nine years of use, and noting that "[a]lthough one party may have been successful in imbuing a name with secondary meaning in three short years, that does not mean that length of time alone is sufficient to establish secondary meaning"). As for sales volume, Haydel's financial records reflect that it sold bead dog-related items worth approximately $30,500 between January 2007 and May 2013. These sales include approximately 80 clothing items and 300 jewelry items. The record does not reflect the number of king cakes that Haydel sold in connection with its marks. Haydel's sales are low compared to the sales of products bearing

19

marks that we have found to have secondary meaning. *See Zatarains*, 698 F.2d 795–96 (holding that the district court's finding of secondary meaning was not clearly erroneous where Zatarain's sold 916,385 cases of Fish-Fri between 1964 and 1979); *Smack Apparel*, 550 F.3d at 472, 478 (affirming summary judgment to mark holders on secondary meaning where recent sales of products bearing the marks exceeded $93 million).

With respect to the third factor, the "amount and manner of advertising," David Haydel, Sr. stated in an affidavit that Haydel spent more than $594,000 between October 2008 and August 2013 on "the development and promotion and expanding the use" of Haydel's bead dog mascot. However, David Haydel did not specify how much of this money was spent on the "development" of the mascot, which may not have affected public perception of the mark. As for promotion and advertising, "spending substantial amounts of money does not of itself cause a mark or trade dress to acquire secondary meaning." *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 541 (5th Cir. 1998), *abrogated on other grounds by TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23 (2001). The relevant question "is not the *extent* of the promotional efforts, but their *effectiveness* in altering the meaning of [the mark] to the consuming public." *Zatarains*, 698 F.2d at 795 (internal quotation marks and citation omitted); *see also Amazing Spaces*, 608 F.3d at 248 (finding an absence of secondary meaning as a matter of law even though plaintiff had spent nearly $725,000 in advertising). Haydel's most significant promotional effort appears to have been "Paws on Parade," an exhibit coordinated with the Louisiana Society for the Prevention of Cruelty to Animals ("LA/SPCA") to raise awareness about animal welfare. Some 74 bead dog sculptures, each about 54 inches long and 42 inches tall, were displayed throughout New Orleans from January to September 2012. Haydel donated the mold to create the sculptures,

which embody Haydel's design mark. The sculptures were painted by New Orleans artists and displayed next to a plaque with various names, including the LA/SPCA, Haydel, the artist, and the organization that sponsored the sculpture.

The Paws on Parade exhibit has little probative value on the question of secondary meaning. The statues do not feature the word mark "Mardi Gras Bead Dog." Although the statues embody Haydel's design mark, the record does not raise an inference that the exhibit led the consuming public to associate that mark with a single source. *See Zatarains*, 698 F.2d at 795. In evaluating the effectiveness of advertising, we have considered the context in which the mark appears. *See Amazing Spaces*, 608 F.3d at 248–49. Haydel's name on the plaque is no more prominent than names of other people and organizations involved in the exhibit. In addition, David Haydel, Jr. conceded that a person could read the plaques only by approaching the sculptures, and not from a moving vehicle. Two Nola Spice customers stated that that they had seen the Paws on Parade statues or photos of these statues, and that they had not known that these statues "were associated with Haydel's Bakery or any store or artist in particular." One of the customers stated that she "thought it was simply a Mardi Gras themed art project." The exhibit's short duration further limits its potential effect. *See Test Masters Educ. Servs. v. Singh*, 46 F. App'x 227, at *4 (5th Cir. 2002) (per curiam) (noting that "[t]he probative value of advertising depends on the presence of data regarding its reach, frequency, and duration").

Haydel's promotional efforts also include the placement, beginning in October 2008, of one or two bead dog statues outside its bakery, atop a pedestal that reads "Haydel's Mardi Gras Bead Dog." David Haydel, Jr. testified that "hundreds of people" take pictures with the bead dog statue every day.

However, there is no evidence that the sculptures led consumers to associate the design and word marks only with Haydel or another single source. *See Amazing Spaces*, 608 F.3d at 248 ("In considering th[e] evidence [of secondary meaning], the focus is on how it demonstrates that the meaning of the mark or trade dress has been altered in the minds of consumers." (quoting *Pebble Beach Co.*, 155 F.3d at 541)). Indeed, Haydel's inclusion of its own name before "Mardi Gras Bead Dog" on the pedestal suggests a generic use of that phrase. *See* 2 *McCarthy on Trademarks* § 15:52 ("Use of a term in its descriptive sense or in a nontrademark sense is not evidence of secondary meaning." (footnotes omitted)); *see also E.T. Browne Drug Co. v. Cococare Prods., Inc.*, 538 F.3d 185, 200 (3d Cir. 2008) (finding that use of the phrase "Palmer's Cocoa Butter Formula" was not probative on the question of whether the phrase "Cocoa Butter Formula" had acquired secondary meaning). In addition, the exposure of a single sculpture in a permanent spot is necessarily limited. Furthermore, Haydel does not claim trademarks in connection with sculptures, but rather in connection with clothing, jewelry, and king cake. Given the bead dog's popularity in New Orleans and the similarities between Haydel's design and a traditional bead dog, even a consumer who associated the large bead dog sculptures with a single source would not automatically associate other merchandise bearing a bead dog image with a single source. *See Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 143 n.3 (2d Cir. 1997) (noting that secondary meaning "depends on whether a significant number of prospective purchasers understand the term when used in connection with the particular kinds of goods involved in the registration certificate as indicative of an association with a specific entity"). With respect to clothing, jewelry, and king cake, Haydel's promotion of its marks is limited. Haydel advertised that merchandise on its website and in Mambo Beat, its annual magazine. In 2010,

Haydel baked two record-sized king cakes and included a "small statue" of its mascot with each piece of cake sold to the public. However, the record does not reflect the effectiveness of this one-day promotional event in creating an association in the minds of consumers between Haydel and its bead dog design.

Press coverage of Haydel's marks, the fourth factor in the analysis of secondary meaning, is also slim. Two short online articles about Paws on Parade include photographs of the statues and mention that Haydel provided the mold. Haydel's magazine Mambo Beat and a magazine titled Rally to Rescue published longer articles that describe Paws on Parade and include Haydel's design and word marks, but there is no evidence of these magazines' circulation or of their impact on public perception. Haydel does not identify any evidence of third-party media coverage of its marks in connection with clothing, jewelry, or king cake.

Haydel argues that Nola Spice's intent in copying Haydel's marks supports a finding of secondary meaning. However, Nola Spice did not use Haydel's word mark, "Mardi Gras Bead Dog." As for Haydel's design mark, Haydel's discussion of secondary meaning does not identify evidence it believes demonstrates Nola Spice's intent to copy that mark. Elsewhere in its briefs, Haydel points to evidence that Duarte briefly posted images of statues from the Paws on Parade exhibit on Nola Spice's webpages on Facebook.com, Pinterest.com, and Twitter.com. However, the record does not support an inference that Duarte knew Haydel provided the mold for these statues, or that she intended to copy Haydel's design in crafting her bead dog jewelry. With respect to the remaining factors, Haydel does not offer any consumer testimony or survey evidence. While survey evidence is not required to establish secondary meaning, it is "'the most direct and persuasive way of establishing secondary meaning.'" *Amazing Spaces*, 608 F.3d at 248 (quoting *Zatarains*, 698

F.2d at 795). We have cited one scholar's observation that "'in a borderline case where it is not at all obvious that [a] designation has been used as a mark, survey evidence may be necessary to prove trademark perception.'" *Id.* at 249 (citing 1 *McCarthy on Trademarks* § 3:3).

In light of the above factors, we agree with the district court that Haydel failed to raise a fact issue as to whether its design and word marks acquired secondary meaning. The overwhelming evidence demonstrates that Haydel's marks are not distinctive and therefore not protectable. Because a mark's legal protectability is an element of a trademark infringement claim, the district court properly granted summary judgment to Nola Spice on its claim for a declaratory judgment that it was not infringing Haydel's marks. The court also properly granted summary judgment to Nola Spice on Haydel's counterclaim of trademark infringement. The district court properly pretermitted discussion of likelihood of confusion.

## II.     Cancellation of Trademark Registrations

A court may cancel the registration of a trademark that it determines is not distinctive. *See* 15 U.S.C. § 1119 ("In any action involving a registered mark the court may . . . order the cancellation of registrations . . . ."); *see also Xtreme Lashes, LLC*, 576 F.3d at 232 ("[I]f the mark is found to be either generic or descriptive and lacking secondary meaning, a court may cancel it."). The district court canceled Haydel's word mark and design mark registrations for all three classifications—clothing, jewelry, and king cake pastries—based on the court's findings that the marks were generic, or, alternatively, descriptive without secondary meaning. Cancellation of Haydel's word and design marks was proper because the record evidence compels the conclusion that these marks are descriptive of Haydel's products but lack secondary meaning.

## III.    Unfair Competition

The district court granted summary judgment to Nola Spice on Haydel's counterclaim of false designation of origin in violation of Section 43(a) of the Lanham Act, which prohibits certain types of unfair competition. 15 U.S.C. § 1125(a); *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 29 (2003). The relevant provision of Section 43(a) creates a cause of action against a person who, in connection with goods or services,

> uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . .

15 U.S.C. § 1125(a)(1)(A). Haydel argues that Nola Spice violated Section 43(a) by engaging in "passing off," which "occurs when a producer misrepresents his own goods or services as someone else's." *Dastar Corp.*, 539 U.S. at 27 n.1. Haydel points to the following record evidence in support of its claim. As of August 14, 2012, Nola Spice's Facebook.com page featured a photograph of Duarte posing with a bead dog sculpture from the Paws on Parade exhibit. Only the sculpture's ears, eyes, and part of its nose are visible in the photograph. Duarte later posted the same photograph on Nola Spice's pages on Twitter.com and Pinterest.com. As of September 7, 2012, Duarte had replaced the photograph on Facebook.com with a photograph of herself posing with another Paws on Parade statue, which has the head of a crawfish and the body of a bead dog. Next to the photograph is an image of a poster, created by Haydel, portraying about thirty miniature versions of the bead dog sculptures

No. 13-30918

from Paws on Parade. None of these photographs or images includes Haydel's name or depicts the bead dog statue that stands outside Haydel's store.

The district court based its grant of summary judgment on a finding that Haydel's marks are unprotectable as a matter of law. Although Section 43(a) "extends beyond mere trademark protection," *Schlotzsky's, Ltd. v. Sterling Purchasing & Nat'l Distrib. Co.,* 520 F.3d 393, 399 (5th Cir. 2008), Haydel's claim is foreclosed because its bead dog design lacks distinctiveness. Given that Haydel's design does not act as a source identifier, the image of a sculpture incorporating that design on Nola Spice's webpages could not "cause confusion . . . as to the origin, sponsorship, or approval" of Nola Spice's goods. 15 U.S.C. § 1125(a)(1)(A); *see Samara Bros.,* 529 U.S. at 210 ("Nothing in § 43(a) explicitly requires a producer to show that its trade dress is distinctive, but courts have universally imposed that requirement, since without distinctiveness the trade dress would not 'cause confusion . . . as to the origin, sponsorship, or approval of [the] goods,' as the section requires." (alterations in original)); *see also Genesee Brewing Co.*, 124 F.3d at 150 (holding that to recover for unfair competition based on the use of a generic term, the plaintiff was required to show, *inter alia*, "an association of origin by the consumer between the mark and the first user, that is, secondary meaning" (internal quotation marks and citation omitted)). Because Haydel's marks lack secondary meaning and are therefore not distinctive, Nola Spice was entitled to summary judgment on Haydel's unfair competition claim.[5]

---

[5] Although Nola Spice's display of sculpture from Paws on Parade does not alone support an unfair competition claim under Section 43(a), our holding does not preclude Haydel from bringing future unfair competition claims if Nola Spice misrepresents its relationship with Haydel in other ways. *See Schlotzsky's, Ltd.*, 520 F.3d at 399–400.

26

## IV.    Trademark Dilution

The district court granted summary judgment to Nola Spice on Haydel's counterclaims for trademark dilution under the Lanham Act and Louisiana law. The Lanham Act, as amended by the Trademark Dilution Revision Act, provides, in relevant part,

> the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

15 U.S.C. § 1125(c)(1). To state a dilution claim under the Lanham Act, Haydel must show that (1) it owns a famous and distinctive mark; (2) Nola Spice has commenced using a mark in commerce that is diluting Haydel's mark; (3) the similarity between Nola Spice's mark and Haydel's mark gives rise to an association between the marks; and (4) the association is likely to impair the distinctiveness of Haydel's mark or harm the reputation of Haydel's mark. *See Nat'l Bus. Forms & Printing, Inc.*, 671 F.3d at 536 (citing *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 264–65 (4th Cir. 2007)). Because Haydel's marks are not distinctive, the district court properly granted summary judgment to Nola Spice on Haydel's federal dilution claim.

Louisiana's anti-dilution statute provides:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

27

La. Rev. Stat. Ann. § 51:223.1. Although a dilution claim under Louisiana law requires a showing of distinctiveness, Louisiana courts have provided little guidance on the meaning of distinctiveness for dilution purposes. *See Advantage Rent-A-Car, Inc. v. Enter. Rent-A-Car, Co.*, 238 F.3d 378, 381 (5th Cir. 2001). In the context of trademark infringement, the Louisiana Supreme Court has adopted the same definition of distinctiveness that applies to a Lanham Act claim: the mark must either be inherently distinctive or have secondary meaning. *Id.* (citing *Gulf Coast Bank v. Gulf Coast Bank & Trust Co.*, 652 So. 2d 1306 (La. 1995)). We believe the Louisiana Supreme Court would apply the same definition for purposes of a dilution claim, and Haydel does not argue otherwise. *See Six Flags, Inc. v. Westchester Surplus Lines Ins. Co.*, 565 F.3d 948, 954 (5th Cir. 2009) (noting that to determine Louisiana law in the absence of authority from the Louisiana Supreme Court, "we must make an *Erie* guess and determine, in our best judgment, how that court would resolve the issue if presented with the same case" (internal quotation marks and citation omitted)). Given that Haydel's marks are not distinctive, the district court's grant of summary judgment to Nola Spice was proper with respect to Haydel's state law dilution claim.

## V.    Copyright Infringement

"To prove copyright infringement, a plaintiff must establish (1) ownership of a valid copyright; (2) factual copying; and (3) substantial similarity." *Armour v. Knowles*, 512 F.3d 147, 152 (5th Cir. 2007) (per curiam). As to the first element, Haydel obtained a certificate of a copyright registration for its work titled "Bead Dog," in the form of "photograph(s), jewelry design, 2-D artwork, [and] sculpture." The Copyright Act provides that a certificate of copyright registration "made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the

copyright." 17 U.S.C. § 410(c). Although the presumption of validity may be rebutted, *see Norma Ribbon & Trimming, Inc. v. Little*, 51 F.3d 45, 47 (5th Cir. 1995), Nola Spice does not develop any argument that Haydel's work as a whole is unprotectable. We therefore do not assess the validity of Haydel's copyright. *See Audler v. CBC Innovis Inc.*, 519 F.3d 239, 255 (5th Cir. 2008) ("A party waives an issue if he fails to adequately brief it." (internal quotation marks and citation omitted)). Nola Spice also does not argue against a finding of factual copying, the second element required for a copyright infringement claim. Rather, Nola Spice argues that the third element is absent because its works are not substantially similar to Haydel's bead dog design.

The district court relied on the merger doctrine in granting summary judgment to Nola Spice on Haydel's copyright infringement claim. The merger doctrine is based on the statutory prohibition against copyright protection for ideas. *See* 17 U.S.C. § 102(b). "If an idea is susceptible to only one form of expression, the merger doctrine applies and § 102(b) excludes the expression from the Copyright Act." *Veeck v. S. Bldg. Code Cong. Int'l, Inc.*, 293 F.3d 791, 801 (5th Cir. 2002). However, examples of bead dogs in the record make clear that the idea of a bead dog may be expressed in various ways. The merger doctrine therefore does not alone preclude a finding of copyright infringement. Still, "we may affirm the district court's decision on any ground supported by the record, even if it was not the basis for the judgment." *Terrebonne Parish Sch. Bd.*, 310 F.3d at 878. We find that the grant of summary judgment was appropriate based on the absence of substantial similarity between Haydel's and Nola Spice's bead dogs.

While the question of substantial similarity "typically should be left to the factfinder, summary judgment may be appropriate if the court can conclude, after viewing the evidence and drawing inferences in a manner most

29

favorable to the nonmoving party, that no reasonable juror could find substantial similarity." *Peel & Co. v. Rug Mkt.*, 238 F.3d 391, 395 (5th Cir. 2001) (footnote omitted). To assess substantial similarity, we have often cited the following test: "[A] side-by-side comparison must be made between the original and the copy to determine whether a layman would view the two works as 'substantially similar.'" *Creations Unlimited, Inc. v. McCain*, 112 F.3d 814, 816 (5th Cir. 1997) (per curiam) (footnote omitted). However, where the copyrighted work contains unprotectable elements, the first step is to distinguish between protectable and unprotectable elements of the copyrighted work. *See Peel & Co.*, 238 F.3d at 398 (holding that the district court erred in failing to identify the original constituent elements of the copyrighted design before comparing the two works); *Kepner-Tregoe, Inc. v. Leadership Software, Inc.*, 12 F.3d 527, 533–34 (5th Cir. 1994) ("To determine the scope of copyright protection in a close case, a court may have to filter out . . . unprotectable elements of plaintiff's copyrighted materials to ascertain whether the defendant infringed protectable elements of those materials."); *see also Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991) (describing an element of infringement as the "copying of constituent elements of the work that are original"). The next inquiry is whether the allegedly infringing work bears a substantial similarity to the protectable aspects of the original work. *See Peel & Co.*, 238 F.3d at 398 ("To support a claim of copyright infringement, the copy must bear a substantial similarity to the protected aspects of the original."). This determination should be based on the perspective of a "layman" or "ordinary observer." *See id.* ("[A] layman must detect piracy without any aid or suggestion or critical analysis by others." (internal quotation marks and citation omitted)). Our precedents also support consideration of the importance of the copied protectable elements to the

No. 13-30918

copyrighted work as a whole. *Positive Black Talk Inc. v. Cash Money Records Inc.*, 394 F.3d 357, 373 n.12 (5th Cir. 2004), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010); *Eng'g Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1343 (5th Cir. 1994).[6]

Applying these principles to Haydel's claim, we first identify the unprotectable elements in Haydel's bead dog design, which is manifested most clearly in sculpture form. Haydel concedes that its bead dog design is a "derivative" work, meaning that it is "based upon one or more preexisting works." 17 U.S.C. § 101. "The copyright in a . . . derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material." *Id.* § 103(b); *see also Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 109–110 (2d Cir. 2001). Haydel concedes that the body of its bead dog design is unprotectable as preexisting material because it mimics the body of a traditional bead dog. Haydel nevertheless contends that its "original contributions include, among other things, the selection and arrangement of a necklace, nose, eyes, and a tail, all made of

---

[6] Our analysis here is similar to the "abstraction-filtration-comparison" test that our circuit has adopted to assess the substantial similarity of computer programs. *See Eng'g Dynamics, Inc.*, 26 F.3d at 1343. Under that test, we abstract the copyrighted program into its constituent parts, filter out unprotectable elements, and compare the remaining protectable expression with the allegedly infringing program to determine whether the defendant misappropriated substantial elements of the plaintiff's program. *Id.* at 1342–43 (quoting *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 834 (10th Cir. 1993)). Several courts and a copyright scholar have found this test, or variations on it, well-suited to analyze copyrighted works other than computer programs. *See Country Kids 'N City Slicks, Inc. v. Sheen*, 77 F.3d 1280, 1284 (10th Cir. 1996) (wooden dolls); *R. Ready Prods., Inc. v. Cantrell*, 85 F. Supp. 2d 672, 683 & n.10 (S.D. Tex. 2000) (advertising letters); *Churchill Livingstone, Inc. v. Williams & Wilkins*, 949 F. Supp. 1045, 1050 (S.D.N.Y 1996) (medical textbooks); 4 *Nimmer on Copyright* § 13.03 (noting that "there is no reason to limit" the filtration test to the realm of computer software).

31

smaller beads." However, anatomical features on replicas of animals are ideas not entitled to copyright protection. *See Blehm v. Jacobs*, 702 F.3d 1193, 1204 (10th Cir. 2012) ("[C]ommon anatomical features such as arms, legs, faces, and fingers [on cartoon figures] . . . are not protectable elements."); *Mattel, Inc. v. Goldberger Doll Mfg. Co.*, 365 F.3d 133, 136 (2d Cir. 2004) ("An upturned nose, bow lips, and wide eyes are the 'idea' of a certain type of doll face. That idea belongs not to Mattel but to the public domain."). As for the "necklace" in Haydel's design, the ring of spheres around the neck of Haydel's bead dog may be characterized as a *collar*. Collars on dogs, like anatomical features, are common ideas that belong to the public domain. Still, while the idea of eyes, a nose, a tail, and a collar are not protectable, the manner in which Haydel expresses these features may be protectable, as long as that expression is original and not dictated by the underlying idea. *See Mattel, Inc.*, 365 F.3d at 135–36 ("The copyright does not protect ideas; it protects only the author's particularized expression of the idea."); *Blehm*, 702 F.3d at 1201 ("A copyright owner's original stylistic choices qualify as protectable expression if the choices are not dictated by the underlying idea.").

We now compare Nola Spice's bead dog to the protectable elements of Haydel's bead dog, assuming the perspective of an ordinary observer and considering the significance of the protectable elements to Haydel's work as a whole. *See Peel & Co.*, 238 F.3d at 398; *Eng'g Dynamics, Inc.*, 26 F.3d at 1343. Haydel argues that only some of Nola Spice's bead dogs are infringing and identifies examples in the record. Focusing on the protectable elements of Haydel's design, the similarity between Nola Spice's and Haydel's bead dogs is the expression of the collar as a ring of small spheres. As for the differences, the torso of Haydel's bead dog has three spheres, while the torso of Nola Spice's bead dog has one sphere. The spheres that make up Haydel's bead dog are

pressed together, whereas visible wire connects the spheres that make up Nola Spice's bead dogs. Whereas the tail of Haydel's bead dog consists of two spheres and no wire, the tails of Nola Spice's bead dogs include a curled wire, either alone or atop one or two spheres. Likewise, the noses of Nola Spice's bead dogs include a curled wire, either alone or atop a single sphere, while the nose of Haydel's bead dog is a single sphere. Unlike Haydel's bead dog, Nola Spice's bead dogs do not have eyes. No reasonable juror could conclude that Nola Spice's bead dogs bear a substantial similarity to the way in which the eyes, nose, and tail are expressed in Haydel's bead dog. Indeed, Haydel focuses its argument on the collar, conceding that its "copyright infringement claim is narrow. Only to the extent that Nola Spice copied Haydel's original expression by, at least adding a necklace made of smaller beads to what would otherwise look like a dog trinket made of larger beads, has Nola Spice infringed Haydel's copyrighted expression." We must therefore decide whether the collar on Nola Spice's bead dogs could suffice to support a finding of substantial similarity in the mind of a reasonable juror.

Because the idea of a collar is unprotectable, only its expression as a string of spheres is relevant to the analysis of substantial similarity. As a threshold matter, we question whether using bead-shaped spheres for a bead dog's collar is sufficiently original to merit copyright protection. *See Feist Publ'ns, Inc.*, 499 U.S. at 348 ("[C]opyright protection may extend only to those components of a work that are original to the author."). Although the requirement of originality demands only a "creative spark, no matter how crude, humble or obvious," the level of creativity must be more than "trivial." *Id.* at 345, 359 (internal quotation marks and citation omitted). Even if a bead-shaped collar possesses the requisite creative spark, its minimal originality counsels against a finding of substantial similarity. *See Harney v. Sony*

*Pictures Television, Inc.*, 704 F.3d 173, 187 (1st Cir. 2013) ("[L]ocating the subject of a photograph in the middle of a frame is an element of minimal originality and an insufficient basis, without more, to find substantial similarity." (internal quotation marks omitted)). In addition, the collar is both qualitatively and quantitatively insignificant in relation to Haydel's work as a whole, which is designed to represent a traditional bead dog trinket and is dominated by unprotectable elements. *See Positive Black Talk Inc.*, 394 F.3d at 373 n.12 (noting other circuits' support for the proposition that the substantial similarity analysis should consider the qualitative and quantitative importance of the copied material to the plaintiff's work as a whole); *Eng'g Dynamics, Inc.*, 26 F.3d at 1343 (noting that the goal of the comparison step is to "determine whether the defendants have misappropriated *substantial elements* of the plaintiff's" work (citing *Gates Rubber*, 9 F.3d at 834) (emphasis added)). In light of these considerations, no reasonable jury could find substantial similarity based solely on Haydel's expression of a collar.

Haydel argues that the "best evidence" of substantial similarity consists of statements by the Haydel family that its customers were confused about the relationship between Nola Spice's bead dogs and Haydel's mascot. Haydel points to a sworn statement by David Haydel, Sr. that he "personally heard several customers of Haydel's Bakery asking whether Nola Spice Designs sells Haydel's MARDI GRAS BEAD DOG jewelry and telling our staff that they (the customers) believed that Nola Spice Designs sold Haydel's MARDI GRAS BEAD DOG jewelry." This vague allegation of consumer confusion by a self-interested party possesses little probative value. *Cf. Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*, 198 F.3d 1143, 1152 (9th Cir. 1999) (finding that "vague," "self-interested" testimony by the founder of the plaintiff company,

alleging confusion by unidentified consumers, "possesse[d] very limited probative value" and "did not create a genuine issue for trial" as to whether the company's claimed trademark had acquired secondary meaning). More important, any confusion by Haydel's customers would have stemmed from a comparison of the two bead dog designs in their entirety, and would therefore have been based largely on unprotectable elements. Given that the substantial similarity analysis requires a focus on protectable elements, Haydel's evidence of confusion does not raise a genuine issue for trial. *See Johnson v. Gordon*, 409 F.3d 12, 19 (1st Cir. 2005) ("[I]n assessing whether substantial similarity exists, an overall impression of similarity may not be enough . . . [i]f such an impression flows from similarities as to elements that are not themselves copyrightable." (internal citation omitted)). Because no reasonable jury could conclude that Nola Spice's and Haydel's bead dogs are substantially similar in protectable expression, the district court properly granted summary judgment to Nola Spice on Haydel's copyright infringement claim.

## VI.   Louisiana Unfair Trade Practices Act

The Louisiana Unfair Trade Practices Act ("LUTPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. Ann. § 51:1405(A). "A business practice is considered 'unfair' if it offends established public policy and is unethical, oppressive, unscrupulous, or substantially injurious. A business practice is 'deceptive' for purposes of LUTPA when it amounts to fraud, deceit or misrepresentation." *Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Parish*, 309 F.3d 836, 843 (5th Cir. 2002) (citing *Jefferson v. Chevron U.S.A. Inc.*, 713 So. 2d 785, 792–93 (La. Ct. App. 1998)). Haydel argues that the district court erred in granting summary judgment to Nola Spice on Haydel's LUTPA claim. However, Haydel supports that

No. 13-30918

argument only by asserting that the district court erred in dismissing its trademark and copyright infringement claims. Haydel waived its argument regarding LUTPA by failing adequately to develop it. *See Audler*, 519 F.3d at 255.

## CONCLUSION

For the above reasons, we AFFIRM the district court's grant of summary judgment to Nola Spice on its claim for a declaratory judgment of non-infringement of Haydel's trademarks, and we AFFIRM the district court's cancellation of those trademarks. We also AFFIRM the district court's grant of summary judgment to Nola Spice on Haydel's claims of trademark infringement, unfair competition, and trademark dilution under the Lanham Act; trademark dilution under Louisiana law; copyright infringement under the Copyright Act; and unfair trade practices under LUTPA.

## APPENDIX

**Haydel's Sculpture**



No. 13-30918

**Haydel's Design Mark**



**Haydel's Jewelry**



No. 13-30918

**Nola Spice's Jewelry**



**Traditional Bead Dog Trinket**

