# United States Court of Appeals for the Fifth Circuit

———————

No. 23-50413

———————

United States Court of Appeals
Fifth Circuit

**FILED**

June 21, 2024

Lyle W. Cayce
Clerk

Appliance Liquidation Outlet, L.L.C.,

*Plaintiff—Appellee*,

*versus*

Axis Supply Corporation,

*Defendant—Appellant*.

———————————————————————

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:21-CV-768

———————————————————————

Before Smith, Haynes, and Douglas, *Circuit Judges*.

Jerry E. Smith, *Circuit Judge*:

This appeal arises from a trademark dispute between two appliance companies in San Antonio. Appliance Liquidation Outlet, L.L.C. ("ALO"), owns and operates a store named Appliance Liquidation Outlet. For over two decades, ALO has used that name to refer to its business. In 2021, Axis Supply Corporation ("Axis") opened an appliance store adorned with a large banner that prominently displayed the words "Appliance Liquidation" and used a digital version of that banner in online advertising.

In the wake of Axis's new store, ALO experienced a rush of customers

who failed to differentiate between the stores and believed that ALO operated both. When Axis refused to change its name, litigation ensued. After a bench trial, the district court found that ALO had valid trademarks in the words "Appliance Liquidation Outlet" and "Appliance Liquidation" and that Axis's banner infringed those marks. The court entered judgment for ALO, enjoined Axis from using ALO's marks or otherwise causing confusion with ALO's brand, and awarded ALO attorney's fees.

Axis appealed, averring that (1) "Appliance Liquidation Outlet" and "Appliance Liquidation" were not valid marks; (2) even if both marks were valid, its banner did not infringe those marks; and (3) the district court erred in awarding ALO attorney's fees. We agree in part. The district court clearly erred in finding that "Appliance Liquidation" is a valid trademark but did not err in finding that "Appliance Liquidation Outlet" is a valid mark that Axis's banner infringed. Thus, we reverse the judgment as to the "Appliance Liquidation" mark, affirm as to the "Appliance Liquidation Outlet" mark, and modify the injunction accordingly to remove reference to the "Appliance Liquidation" mark. Finally, the district court abused its discretion in awarding attorney's fees, so we vacate the fee award.

## I.

As stated, ALO's store has gone by the name "Appliance Liquidation Outlet" for over twenty years.[1] The store displays that name prominently on a large billboard on top of its physical location.

---

[1] Occasionally, ALO employees refer to the business in shorthand as "Appliance Liquidation."

No. 23-50413



In addition to displaying its billboard, ALO engages in promotional activities to boost recognition of its brand in San Antonio. For example, ALO partners with local sports teams who promote the business during games by including the company name on stadium billboards. ALO also puts on exhibitions of antique appliances, hosts car shows, and supports community artists. Finally, ALO pays for search engine optimization, so that it comes up first when one conducts an internet search for appliance stores in San Antonio. That investment has paid dividends, as ALO grossed about $3.5 million in 2022.[2]

In 2021, Axis opened an appliance store in a different part of San Antonio, adorned with large banners displaying "Appliance Liquidation."

_____

[2] ALO also uses a logo to identify its business. The logo is not at issue in this appeal.

No. 23-50413



Those banners were also used in online advertising on social media.



Axis avers that the banners represented merely the existence of a sale on appliances. Nevertheless, soon after Axis opened its new store, people in San Antonio began to conflate the two businesses. For instance, ALO's owner was congratulated on opening a second location. Numerous consumers contacted ALO believing it to be Axis. And, in one incident, the San Antonino police arrived at ALO's store believing Axis owned it.

Troubled by those developments, ALO's owner approached Axis and

requested that it change the name on the front of its store. Axis refused, and ALO sued in state court under the Lanham Act (15 U.S.C. § 1051 *et seq.*) and Texas law, alleging, *inter alia*, that Axis was engaged in unfair competition and had infringed its trademarked business name.[3] Axis removed to federal court.

After discovery, the parties consented to a bench trial. At the pretrial conference, Axis represented that it was no longer using "Appliance Liquidation" in connection with its business. Axis avers that the change was done in conjunction with a strategic relocation of its store. But a transcript of the pretrial conference does not appear in the record, so the record does not reflect why Axis changed its name.

The case went to trial despite the confusion surrounding Axis's name change. The district court found that ALO "utilized the name 'Appliance Liquidation' or 'Appliance Liquidation Outlet'" to refer to its store and that ALO had a valid trademark in both phrases. The district court further found that Axis's use of "Appliance Liquidation" infringed those marks.

The district court entered judgment for ALO, permanently enjoining Axis from using ALO's marks or causing confusion between the two businesses. The court also awarded ALO attorney's fees, finding that Axis had litigated the case in an unreasonable manner by "notify[ing] the Court one week before trial that it changed the name of its store" despite "being unwilling to change its name prior to litigation [or at any point] throughout the year and a half leading up to trial."

---

[3] The Texas law relevant to this case is identical to the Lanham Act in all material respects. *See Viacom Int'l, Inc. v. IJR Cap. Invs., L.L.C.*, 891 F.3d 178, 184 (5th Cir. 2018) ("A trademark infringement action under Texas common law is analyzed in the same manner as a Lanham Act claim." (citations omitted)). Thus, the parties do not brief any Texas law, and ALO's claims rise and fall with the Lanham Act.

No. 23-50413

Axis appealed, averring that the district court (1) erred in finding that ALO had valid trademarks in the words "Appliance Liquidation" and "Appliance Liquidation Outlet"; (2) erred in finding that Axis infringed ALO's "Appliance Liquidation Outlet" mark; and (3) abused its discretion in awarding attorney's fees.

II.

We address first Axis's contention that the district court erred in finding that ALO had valid trademark in the words "Appliance Liquidation." Section 1125 of the Lanham Act "creates a cause of action for infringement of unregistered marks." *Rex Real Est. I, L.P. v. Rex Real Est. Exch., Inc.*, 80 F.4th 607, 616 (5th Cir. 2023) (citation omitted).[4]  A trademark "includes any word, name, symbol, or device, or any combination thereof . . . [used] to identify and distinguish . . . goods." 15 U.S.C. § 1127. In short, "[t]o be a trademark, a designation must do the job of a trademark." 1 McCarthy on Trademarks and Unfair Competition § 3:4 (5th ed. 2024) (hereinafter McCarthy). Thus, the words "Appliance Liquidation" are "legally protectable if [ALO] establishes ownership by demonstrating that it uses [those words] as a source identifier." *Viacom*, 891 F.3d at 185 (citations omitted).[5]

_____

[4] ALO had not registered "Appliance Liquidation Outlet" or "Appliance Liquidation" with the United States Patent and Trademark Office at the time of trial. Thus, it is not entitled to a "presumption of validity" for its marks and must "demonstrate both ownership and distinctiveness." *Unified Buddhist Church of Vietnam v. Unified Buddhist Church of Vietnam – Giao Hoi Phat Giao Viet Nam Thong Nhat*, 838 F. App'x 809, 812 (5th Cir. 2020) (per curiam) (citing 15 U.S.C. §§ 1057(b), 1115(a) and *Viacom*, 891 F.3d at 186–87). The principles of law underlying the validity and infringement of a mark, however, are largely the same whether or not the mark has been registered. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992) (citation omitted).

[5] Whether a party uses a mark as a source identifier is different from whether the mark is distinctive, though the former is litigated much less frequently than the latter.

6

No. 23-50413

"Whether [a party] actually uses [a trademark] as a source identifier is a question of fact." *Id.* at 186 (citations omitted). In a bench trial, "[w]e review the District Court's factual findings for clear error. That means we may not set those findings aside unless . . . we are left with the definite and firm conviction that a mistake has been committed." *Alexander v. S. Car. Conf. of the NAACP*, No. 22-807, 2024 U.S. LEXIS 2262, at *24–25 (U.S. May 23, 2024) (internal quotation marks and citation omitted).

ALO offered insufficient evidence that it uses "Appliance Liquidation" as a source identifier. The record does contain evidence that ALO's employees referred to the business as "Appliance Liquidation." For example, one employee testified that she tells people she works at "Appliance Liquidation" and that she answers the phone using "Appliance Liquidation" and "Appliance Liquidation Outlet" interchangeably. And one of ALO's owners testified that advertisements would "either say Appliance Liquidation or Appliance Liquidation Outlet." But both witnesses made clear that "Appliance Liquidation" was a shorthand for ALO's actual name— "Appliance Liquidation Outlet." The record does not contain any specific instance of ALO's using "Appliance Liquidation" intentionally to identify its store.

---

Distinctiveness asks whether a mark *can* act as a source identifier. *See Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 237 (5th Cir. 2010). That is separate from whether a party uses a mark as a source identifier. *Cf.* 1A Gilson on Trademarks § 3.02[4][b] (2023) ("A trademark owner must use its mark in a way that is sufficiently public for consumers to connect the mark with the owner.").

A valid trademark requires both use and distinctiveness. *See Viacom*, 891 F.3d at 185–86 ("[T]he two issues are separate questions, and because the use-as-a-source-indicator requirement is at issue in this case [plaintiff] must establish both use and distinctiveness." (internal citations omitted)). A mark may have the potential to be distinctive but is never used by a party to identify its goods. Likewise, a party may intend for a mark to identify its goods, but the mark cannot do so because it lacks distinctiveness. In either case, the mark would be invalid. *See id.*

We cannot reverse a district court's factual finding after a bench trial "simply because we are convinced that we would or could decide the case differently." *Guzman v. Hacienda Recs. & Recording Studio, Inc.*, 808 F.3d 1031, 1036 (5th Cir. 2015) (citation omitted). But we do not need a complete absence of evidence to reverse. *Cf. Theriot v. Par. of Jefferson*, 185 F.3d 477, 490 (5th Cir. 1999) (stating that a district court could err "despite evidence to support it." (citation omitted)). Given that none of the exhibits in the record supported the testimony concerning ALO's use of "Appliance Liquidation," we are left with a definite and firm conviction that the district court committed a mistake in finding that ALO has a valid trademark in "Appliance Liquidation." *Guzman*, 808 F.3d at 1036 (citation omitted).

## III.

We address Axis's contention that the district court erred in finding that ALO had a valid trademark in "Appliance Liquidation Outlet." Those words adorn a massive white billboard atop ALO's store, so it cannot be disputed that ALO uses them to identify its store. Thus, unlike in Section II, the validity of the disputed "Appliance Liquidation Outlet" mark turns not on whether ALO used "Appliance Liquidation Outlet" as a source identifier, but on whether those words are distinctive. *See Viacom*, 891 F.3d at 185–86.

A trademark must be distinctive to be valid, and a distinctive mark is one capable of identifying the source of its user. *See Amazing Spaces*, 608 F.3d at 237. There are two types of distinctive marks. "A mark is inherently distinctive if its intrinsic nature serves to identify a particular source." *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000) (cleaned up). A mark can also acquire distinctiveness "if it has developed secondary meaning, which occurs when, in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself." *Id.* at 211 (cleaned up).

"Distinctiveness is often expressed on an increasing scale: Word marks may be (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *USPTO v. Booking.com B.V.*, 140 S. Ct. 2298, 2302 (2020) (internal quotation marks and citation omitted). "A generic term connotes the basic nature of articles or services rather than the more individualized characteristics of a particular product."[6] Therefore, "[g]eneric terms are *never* eligible for trademark protection." *Union Nat'l Bank of Tex., Laredo, Tex. v. Union Nat'l Bank of Tex., Austin, Tex.*, 909 F.2d 839, 844 (5th Cir. 1990). On the other hand, "[d]escriptive marks can become distinctive, but only by acquiring secondary meaning." *Future Proof Brands, L.L.C. v. Molson Coors Bev. Co.*, 982 F.3d 280, 290 (5th Cir. 2020) (internal quotation marks and citation omitted). Finally, "[w]ord marks that are suggestive, arbitrary, or fanciful are inherently distinctive." *Rex Real Est. I*, 80 F.4th at 618 (citation omitted).

That all means that courts assess the validity of a word mark by categorizing it. *See generally* 1 McCarthy § 11:2. If the mark is arbitrary, fanciful, or suggestive, it is inherently distinctive and valid. If the mark is generic, it is invalid. If the mark is descriptive, it may or may not be valid, and the court must determine whether it has acquired secondary meaning in the minds of consumers. If so, it has acquired distinctiveness and is valid; if not, it is invalid.

*A. The district court did not clearly err in finding that "Appliance Liquidation Outlet" was a descriptive mark.*

The district court found that "Appliance Liquidation Outlet" was a

---

[6] *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 790 (5th Cir. 1983) (internal quotation marks and citation omitted), *abrogated on other grounds by KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004).

No. 23-50413

descriptive mark.[7]  Axis contends that "Appliance Liquidation Outlet" is a generic term for discount appliance stores.

"Descriptive marks convey an immediate idea of the qualities, characteristics, effect, purpose, or ingredients of a product or service." *Future Proof*, 982 F.3d at 291 (cleaned up). "[I]f the word conveys information about the product, it is descriptive." *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 539 (5th Cir. 2015) (citation omitted). Thus, if "competitors would be likely to need the terms used in the trademark in describing their products," the mark is descriptive. *Id.* (citation omitted).

"A generic term," on the other hand, "names a class of goods or services rather than any particular feature or exemplification of the class." *Booking.com*, 140 S. Ct. at 2304 (cleaned up). It "refers to the genus of which the particular product is a species." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985) (citation omitted). The test for genericness focuses on the perception of consumers. If a word or combination of words "is not a generic name to consumers, it is not generic." *Booking.com*, 140 S. Ct. at 2305. Thus, a term is not generic if it "might also convey to consumers a source-identifying characteristic." *Id.* at 2306.[8]

---

[7] ALO does not aver that "Appliance Liquidation Outlet" is arbitrary, fanciful, or suggestive.

[8] The district court believed that the "source-identifying" language from *Booking.com* eliminated the distinction between descriptive marks that lacked secondary meaning and generic marks. We disagree that the Supreme Court took that drastic step. True, a descriptive mark has secondary meaning if its "primary significance [to consumers] is to identify the source of the product rather than the product itself." *Wal-Mart*, 529 U.S. at 211 (citation omitted). So, whether the mark serves as a source-identifier for consumers is relevant to both acquired distinctiveness and genericness. But such overlap is not new. *See Park 'N Fly*, 469 U.S. at 194 ("Marks that constitute a common descriptive name are referred to as generic.").

Generic terms refer to classes of goods, whereas descriptive marks "describe[] the

No. 23-50413

Trademark "categorization is a question of fact." *Xtreme Lashes, L.L.C. v. Xtended Beauty, Inc.*, 576 F.3d 221, 232 (5th Cir. 2009). Here, the district court had enough evidence from which to find that "Appliance Liquidation Outlet" conveyed "source-identifying characteristic[s]" to consumers in San Antonino. *Booking.com*, 140 S. Ct. at 2306. For instance, one of ALO's employees testified that people in San Antonio recognized "Appliance Liquidation Outlet" as referring to ALO's specific store. That same employee also testified that "appliance liquidation outlets" and "appliance liquidators" were not terms that described the "kind of the industry or [ALO's] type of business." One of ALO's owners also testified that he would not use "Appliance Liquidation Outlet" or "Appliance Liquidation" to refer to other businesses in his industry.

That evidence supports an inference that consumers in San Antonio perceive "Appliance Liquidation Outlet" as "convey[ing] information about the" store, *Nola Spice*, 783 F.3d at 539 (citation omitted), instead of representing the name of a class of services or businesses, *see Booking.com*, 140 S. Ct. at 2304. Thus, the district court did not clearly err in finding that "Appliance Liquidation Outlet" is a descriptive mark.

B. *The district court did not clearly err in finding that "Appliance Liquidation Outlet" had acquired secondary meaning among San Antonio consumers.*

A descriptive mark becomes "distinctive," and thus valid, "only by acquiring secondary meaning." *Future Proof*, 982 F.3d at 290 (internal quota-

_____

qualities or characteristics of a good." *Id.* Thus, the source-identifying test for genericness asks whether "consumers . . . perceive [the mark] to signify that class" as distinguished from a "species, or a kind, of the class." 1A Gilson on Trademarks § 2.02[6][a] (2023). The source-identifying test for secondary meaning, on the other hand, asks whether, in the minds of consumers, the descriptive terms that identify the species further "identify the source of the [species] rather than the [species] itself." *Viacom*, 891 F.3d at 190 (citation omitted).

11

tion marks and citation omitted). "A mark develops secondary meaning when, in the minds of the public, the primary significance of the mark is to identify the source of the product rather than the product itself." *Viacom*, 891 F.3d at 190 (cleaned up). "Whether a mark has acquired secondary meaning is a question of fact." *Id.* (citation omitted). [9]

> To determine whether a mark has acquired secondary meaning, courts consider the following seven factors: (1) length and manner of use of the mark or trade dress, (2) volume of sales, (3) amount and manner of advertising, (4) nature of use of the mark or trade dress in newspapers and magazines, (5) consumer-survey evidence, (6) direct consumer testimony, and (7) the defendant's intent in copying the mark.

*Id.* (cleaned up). The district court did not use all seven factors when finding that "Appliance Liquidation Outlet" had acquired secondary meaning in San Antonio. Instead, it relied primarily on direct consumer testimony and Axis's intent. That was not error *per se*, as "the primary element of secondary meaning is a mental association in the buyers' minds between the alleged mark and a single source of the product." *Beatriz Ball, L.L.C. v. Barbagallo Co.,* 40 F.4th 308, 317 (5th Cir. 2022) (per curiam) (citation omitted). But to encourage district courts to proceed through each of the factors in a way that facilitates appellate review, and because we may affirm on any ground supported by the record,[10] we take each factor in turn.

1. Length and manner of use:

ALO has used its mark for over two decades. Extensive periods of use

_____

[9] Though secondary meaning is a question of fact to be reviewed for clear error following a bench trial, "[t]he burden of demonstrating secondary meaning is substantial and requires a high degree of proof," *Nola Spice*, 783 F.3d at 544 (internal quotation marks and citation omitted).

[10] *Meche v. Doucet*, 777 F.3d 237, 244 n.5 (5th Cir. 2015) (citation omitted).

can make a mark more likely to have acquired secondary meaning. *See Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 476–77 (5th Cir. 2008).

But length of time alone is not always sufficient to establish secondary meaning. *See Bank of Tex. v. Com. Sw., Inc.*, 741 F.2d 785, 788 (5th Cir. 1984). Instead, the key is how that mark has been used during the relevant period. For example, in *Smack*, the university put its color scheme "on all manner of materials . . . and such prominent display support[ed] a finding of secondary meaning." *Smack*, 550 F.3d at 476–77 (citation omitted).[11]  Contrast that with *Amazing Spaces*, where this factor weighed against secondary meaning because the trademark "was almost invariably used not as a stand-alone mark but [as an] . . . integral part of several marks that Amazing Spaces uses." 608 F.3d at 249 (internal quotation marks omitted).

The record supports an inference that ALO has associated its business with "Appliance Liquidation Outlet" for over two decades.  And it has done so publicly and prominently by placing the words on a large billboard atop its store.  That level of sustained and striking use makes ALO more like the university's century-plus consistent use of their color schemes in *Smack* than like the company's integrated use in *Amazing Spaces*.  Thus, this factor weighs in favor of secondary meaning.

2. Volume of sales:

There is no bright line at which the volume of sales tilts toward a finding of secondary meaning.  In one case, we stated that $30,500 in sales over roughly 6.5 years weighed against secondary meaning for a small busi-

---

[11] *See also Viacom*, 891 F.3d at 190 (The factor favored secondary meaning where the mark was "a central element" of the business and where the plaintiff made "recurrent use of [the mark] over the past eighteen years in a widely viewed television program.").

ness. *See Nola Spice*, 783 F.3d at 544. In another, we remanded so the district court could consider whether a sales total of $6.6 million over the course of 10 years made this factor favor secondary meaning. *See Beatriz Ball*, 40 F.4th at 318. ALO grossed about $3.5 million in 2022. Guided by *Beatriz Ball* and *Nola Spice*, we cannot say it would be clear error for the district court to find that this factor favors of secondary meaning.

3. The amount and manner of advertising:

"The relevant question with regard to factor three . . . is not the extent of the promotional efforts but their effectiveness in altering the meaning of the mark to the consuming public." *See Viacom*, 891 F.3d at 191 (cleaned up). Thus, this factor looks to whether ALO has promoted its mark and at that promotion's effectiveness. Where "promotion of [a plaintiff's] mark[] is limited," this factor is unlikely to weigh in favor of secondary meaning. *Nola Spice*, 783 F.3d at 546. But even if ALO used its mark in "numerous promotional materials," *Smack*, 550 F.3d at 477, it must still show the effectiveness of that advertising at "creating an association in the minds of consumers" between the two products, *Nola Spice*, 783 F.3d at 546. "The effectiveness of this advertising [can be] evident from the success of product sales" and need "not be[] directly proven." *Viacom*, 891 F.3d at 191.

ALO has presented evidence of advertising in amounts reasonable for a business of its size. Its sole location is adorned with a massive billboard displaying "Appliance Liquidation Outlet" prominently. It also partners with local sports teams to display its name at games.[12] These advertising

---

[12] Axis is correct that one of ALO's owners testified that ALO does "very little advertisement." Still, other record evidence contradicted that statement, and "the clearly erroneous standard of review . . . requires even greater deference to the trial court's findings when they are based upon determinations of credibility." *Guzman*, 808 F.3d at 1036 (internal quotation marks and citations omitted). The district court was entitled to credit

efforts have "creat[ed] an association in the minds of consumers" between ALO's store and the words "Appliance Liquidation Outlet." *Nola Spice*, 783 F.3d at 546.

The record contains multiple instances of consumers' hearing the words "Appliance Liquidation Outlet" and associating the name with ALO. One witness testified that "people immediately recognize the name Appliance Liquidation Outlet." Another witness testified that he used ALO for some of his appliance needs and associated plaintiff's store with the words "Appliance Liquidation Outlet." And, as discussed in factor two, ALO grossed millions of dollars in 2022. Such evidence is exactly the type of indirect evidence *Viacom* said is sufficient to demonstrate the effectiveness of ALO's advertising at shaping consumer perception. *See* 891 F.3d at 191. This factor weighs in favor of secondary meaning.

4. Use of the mark in newspapers and magazines:

"In considering [this factor], courts consider to what extent third-party media have reported on the purported trade[mark]." *Beatriz Ball*, 40 F.4th at 318 (citations omitted). "The district court [must] discern whether these publications impacted public perception of the trademark." *Id.* at 319 (cleaned up). In *Nola Spice*, our court held that this factor did not weigh in favor of secondary meaning where the mark holder presented only "[t]wo short online articles" and offered "no evidence of these magazines' circulation or their impact on public perception." 783 F.3d at 546.

ALO cites what it claims are four instances of third-party media coverage. But one of the articles ALO references is an art magazine that mentions "Appliance Liquidation Outlet" briefly to highlight its support of

_____

evidence showing ALO's promotion of its mark and to discredit the owner's statement.

artists. That does not reach the level of "report[ing] on the purported trade-[mark]." *Beatriz Ball*, 40 F.4th at 318 (citations omitted). ALO next points to an award it won that appears to have been sent directly to ALO. There is no evidence any member of the public had access to the award. Thus, the award cannot fairly be deemed "[p]ress coverage," *Nola Spice*, 783 F.3d at 546, or a "publication[]," *Beatriz Ball*, 40 F.4th at 319.

So, it appears that only two of the four sources ALO cites suffice as publications that report on the "Appliance Liquidation Outlet" mark.[13] ALO has not pointed to evidence of the circulation of those online articles and has not demonstrated their impact on public perception. Therefore, just like the mark holder in *Nola Spice*, ALO has presented only "[t]wo short online articles" and "no evidence of [their] circulation or their impact on public perception." 783 F.3d at 546. This factor does not weigh in favor of secondary meaning.

5. Consumer surveys:

ALO has not presented any consumer-survey evidence. Though "[w]e have consistently expressed a preference for an objective survey of the public's perception of the mark at issue," *Amazing Spaces*, 608 F.3d at 248 (internal quotation marks and citations omitted), "survey evidence is not required to establish secondary meaning," *Viacom*, 891 F.3d at 191 (citation omitted).

6. Direct consumer testimony:

The district court based its finding of secondary meaning in large part on evidence that consumers associated "Appliance Liquidation Outlet" with

---

[13] ALO cited an online article about San Antonio's best stores and an online article about ALO hosting an event to promote its business.

ALO's store.  ALO put one consumer on the stand who testified that that person associated the words "Appliance Liquidation Outlet" with ALO's business.  Axis attacks the credibility of that witness on appeal.  But credibility determinations at a bench trial are entitled to extreme deference.[14]  So, the district court was entitled to find that at least one consumer associated "Appliance Liquidation Outlet" with ALO's store.  ALO also offered out-of-court statements made by consumers who associate "Appliance Liquidation Outlet" with ALO.  Such statements can be considered for the purpose of demonstrating secondary meaning because our court has looked previously to "letters and emails," "evaluation forms," and "statements from individuals" when evaluating this factor.[15]

Therefore, the district court was presented with ample evidence, both from the witness stand and from various out-of-court statements, to support its finding that this factor weighed in favor of secondary meaning.

7. Intent in copying the mark:

This factor weighs in favor of secondary meaning where a defendant has "intentional[ly] cop[ied]" the plaintiff's mark.  *See Amazing Spaces*, 608 F.3d at 249.  A plaintiff's mark likely has secondary meaning if the defendant used something similar "believe[ing] that the [plaintiff's mark] had secondary meaning that could influence consumers."  *Smack*, 550 F.3d at 477.  In short, if a defendant thinks there is value in the plaintiff's mark,

---

[14] *See Guzman*, 808 F.3d at 1036 ("[T]he clearly erroneous standard of review . . . requires even greater deference to the trial court's findings when they are based upon determinations of credibility." (internal quotation marks and citations omitted)).

[15] *Test Masters Educ. Servs., Inc. v. Robin Singh Educ. Servs., Inc.*, 799 F.3d 437, 447 (5th Cir. 2015); *cf. Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 458 (5th Cir. 2017) (holding that such statements are not hearsay for determining likelihood of confusion).

consumers likely do as well. Still, the mere fact that a defendant uses a plaintiff's mark after the initiation of litigation does not establish intent to copy for this factor.[16]

The district court appeared to find that this factor weighed in favor of secondary meaning because Axis used a name similar to ALO's yet did not provide consumers with any contact information or service infrastructure. Record evidence supports both those findings. The words on Axis's banner ("Appliance Liquidation") are nearly identical to ALO's billboard ("Appliance Liquidation Outlet"). And the evidence showed that ALO never provided any contact information on its social media site or gave prospective customers a phone number to call.

Axis's strikingly similar banner, coupled with its complete lack of a service infrastructure and its recent entry into the market, allows the district court to infer that Axis intended to copy ALO's mark. At a minimum, it goes beyond mere awareness of ALO's mark or merely using the mark after the initiation of litigation. Thus, we are not left with a "definite and firm conviction that a mistake has been committed" in finding that this factor weighs in favor of secondary meaning. *Guzman*, 808 F.3d at 1036 (citation omitted).

8. The final tally:

The district court had ample evidence from which to find that "in the minds of the public, the primary significance of ['Appliance Liquidation Outlet'] is to identify" ALO's store. *Viacom*, 891 F.3d at 190 (citation omitted). Of the seven factors our circuit uses to evaluate whether a mark has

---

[16] *See Amazing Spaces*, 608 F.3d at 249 ("Amazing Spaces also claims that intentional copying has been shown because Metro constructed a facility that incorporated a star design after this lawsuit had been filed. But this chronology does not bear on whether Metro's use of a common design was intentional copying of Amazing Spaces's design.").

acquired secondary meaning, five support the district court's finding. Thus, "Appliance Liquidation Outlet" has acquired secondary meaning in the minds of San Antonino consumers, has acquired distinctiveness, and is a valid trademark.

## IV.

Having determined that the district court did not clearly err in finding that "Appliance Liquidation Outlet" is a valid trademark, we must now decide whether it properly found Axis infringed that mark.

"[L]ikelihood of confusion [is] the paramount question in a trademark infringement action." *Streamline*, 851 F.3d at 453 (internal quotation marks and citation omitted). A plaintiff must demonstrate that "the defendant's use of [its] trademark creates a likelihood of confusion as to source, affiliation, or sponsorship." *Jim S. Adler, P.C. v. McNeil Consultants, L.L.C.*, 10 F.4th 422, 426 (5th Cir. 2021) (cleaned up). "Likelihood of confusion is a question of fact" that we review for clear error following a bench trial. *Viacom*, 891 F.3d at 192 (citation omitted).

Our circuit assesses the likelihood of confusion with a non-exhaustive list of eight digits:

> (1) the type of mark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, (7) any evidence of actual confusion, and (8) the degree of care exercised by potential purchasers.

*Streamline*, 851 F.3d at 453 (cleaned up). "Two of those digits possess particular prominence: The sixth—bad intent—is not necessary but may alone be sufficient to justify an inference that there is a likelihood of confusion." *Future Proof*, 982 F.3d at 289 (internal quotation marks and citation omitted).

And "the seventh—actual confusion—constitutes the best evidence of a likelihood of confusion." *Id.* (internal quotation marks and citation omitted). Indeed, we have said that "very little proof of actual confusion" can suffice to "prove the likelihood of confusion." *See Xtreme Lashes*, 576 F.3d at 229–30 (citation omitted).[17]

Accordingly, the district court based its finding of infringement entirely on evidence of actual confusion between ALO's store and Axis's store. Given the repeated instances of actual confusion presented at trial, we cannot say that was a clearly erroneous conclusion.

"A plaintiff may show actual confusion using anecdotal instances of consumer confusion, systematic consumer surveys, or both." *Streamline*, 851 F.3d at 457 (citation omitted). "However, not all confusion counts: Evidence of actual confusion must show more than a fleeting mix-up of names; rather it must show that the confusion was caused by the trademarks employed and it swayed consumer purchases." *Id.* (cleaned up).

Likewise, "we have rejected anecdotal evidence of actual confusion when the proponent did not show that a misleading representation by the defendant, as opposed to some other source, caused a likelihood of confusion." *Id.* (cleaned up). But direct, live, testimony is not required *per se*, as "[w]e have previously rejected hearsay objections to indirect testimony about actual confusion" because such testimony is not "offered for the truth of the matter asserted." *Id.* at 458 (citation omitted).

---

[17] *See also World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir. 1971) ("There can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion. Moreover, reason tells us that while very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof." (internal citation omitted)).

ALO offered several pieces of evidence showing actual confusion between the two stores. For instance, ALO presented a log of interactions its employees had with consumers who believed its store was affiliated with Axis's. That log detailed instances of consumers who called or came in person to ask for items Axis posted about on social media. It also detailed multiple instances of customers' asking ALO to service products they had purchased from Axis.

In *Armco, Inc. v. Armco Burglar Alarm Co.*, 693 F.2d 1155 (5th Cir. 1982), we held that that type of evidence supported a finding of actual confusion. There, the plaintiffs had demonstrated actual confusion where an "employee[] testified that he had received phone calls at least once a month from people trying to reach" the defendants. *Id.* at 1160. And in *Streamline*, our court held that the plaintiffs had demonstrated actual confusion in part because they "received a call from a purchasing agent . . . who said he had a pressure vessel" from the defendants. 851 F.3d at 448, 457.

Axis counters that the log fails to show that any confusion stemmed from the use of its banner and that ALO has not shown that the banner has swayed consumer purchases. The record belies Axis's contentions. The repeated and persistent flood of mistaken inquires by individuals in San Antonio who believed ALO was Axis and *vice versa* occurred shortly after Axis opened for business and shows that Axis's banner caused more than a fleeting mix-up of names. *See id.* The fact that several of those inquires came from consumers seeking products advertised on social media—where Axis used its banner as a profile—supports the inference that "the confusion was caused by the trademarks employed." *Id.* (cleaned up). And several of ALO's log entries show that consumers arrived at ALO looking for sales that ALO was not running. So, Axis's use of "Appliance Liquidation" likely swayed consumer purchases. *See id.*

Therefore, the district court did not commit clear error in finding that Axis's use of a banner displaying "Appliance Liquidation" caused actual consumer confusion with ALO's "Appliance Liquidation Outlet" trademark. And, given the repeated instances of actual confusion presented at trial, the court permissibly found infringement on this digit alone. *See Xtreme Lashes*, 576 F.3d at 229–30.

## V.

Finally, we address the award of attorney fees under 15 U.S.C. § 1117. Such an award is reviewed for an abuse of discretion. *See Rolex Watch USA, Inc. v. Beckertime, L.L.C.*, 96 F.4th 715, 720 (5th Cir. 2024). The Lanham Act allows a "court in exceptional cases [to] award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). The Supreme Court has never explained when a case is "exceptional" under § 1117(a). But in *Octane Fitness, L.L.C. v. ICON Health & Fitness, Inc.*, 572 U.S. 545 (2014), the Court construed identical language in Section 285 of the Patent Act. 35 U.S.C. § 285. Our court has "merge[d] *Octane Fitness*'s definition of 'exceptional' into our interpretation of § 1117(a)." *Baker v. DeShong*, 821 F.3d 620, 625 (5th Cir. 2016).

Thus, "an exceptional case is one where (1) in considering both governing law and the facts of the case, the case stands out from others with respect to the substantive strength of a party's litigating position; or (2) the unsuccessful party has litigated the case in an 'unreasonable manner.'" *Id.* (citing *Octane Fitness*, 572 U.S. at 554). A party seeking attorney's fees must prove either of those prongs by "a preponderance of the evidence." *Octane Fitness*, 572 U.S. at 557 (citations omitted).

That would all be simple enough were it not for *Spectrum Association Management, L.L.C. v. Lifetime HOA Management L.L.C.*, 5 F.4th 560 (5th Cir. 2021). *Spectrum* did not cite *Baker* and relied on pre-*Octane* cases to hold

that "[t]o make an 'exceptional case' showing, the prevailing party bears the burden of demonstrating by clear and convincing evidence that the defendant 'maliciously, fraudulently, deliberately, or willfully infringes the plaintiff's mark.'" *Id.* at 566–67 (quoting *Procter & Gamble Co. v. Amway Corp.*, 280 F.3d 519, 527 (5th Cir. 2002)). *Spectrum* believed that *Octane Fitness*'s standard provided additional grounds for making a case exceptional, adding to this circuit's test but not replacing it.[18]

*Spectrum* is partially inconsistent with *Baker*. *Baker* made clear that "[i]n light of the Supreme Court's clear guidance under § 285—and given the parallel purpose, structure, and language of § 1117(a) to § 285—we join our sister circuits in their reading of 'exceptional' under *Octane Fitness* and construe the same meaning here." 821 F.3d at 624 (citations omitted). "What's more, it stands to reason that in overruling . . . the same precedent upon which this court relied to require bad faith by clear and convincing evidence in this circuit—the *Octane Fitness* Court has provided clear guidance from which we do not stray." *Id.* at 625 (footnote omitted).[19]

That means *Baker* construed *Octane Fitness* as replacing, not supplementing, our prior test. Post-*Baker*, courts in this circuit must use the *Octane Fitness* test to determine whether a fee award is justified under § 1117(a). *Spectrum* strayed from circuit precedent when it held that the pre-*Octane Fitness* clear-and-convincing-evidence standard remained good law. That

---

[18] 5 F.4th at 567 ("*Additionally*, an award of attorneys' fees may be warranted either where the prevailing party stood out in terms of the strength of its litigating position or where the non-prevailing party litigated the case in an unreasonable manner." (cleaned up)).

[19] *See also All. for Good Gov't v. Coal. for Better Gov't*, 919 F.3d 291, 294–95 (5th Cir. 2019) (implying that *Octane Fitness* was the sole standard for judging the exceptionality of a case under § 1117(a)).

No. 23-50413

part of the opinion, therefore, is subject to the rule of orderliness.[20] *Spectrum* was correct, however, to imply that *Octane Fitness* did not forbid courts from considering evidence of bad faith or willful infringement when applying its test.

*Octane Fitness* expanded the category of cases that qualify as "exceptional" for § 1117(a). Whether a party has infringed or acted in bad faith can be relevant to whether a case is exceptional under *Octane Fitness*'s two-prong test.[21] But such a showing is no longer an absolute prerequisite to a fee award under § 1117(a).[22]

## VI.

Having clarified the standard for when a case is exceptional under § 1117(a), we must determine whether the district court abused its discretion when it found that Axis had litigated this case in an unreasonable manner.[23]

---

[20] *See United States v. Guzman-Rendon*, 864 F.3d 409, 411 n.1 (5th Cir. 2017) ("[T]his circuit's rule of orderliness . . . prohibits one panel from overruling another panel absent intervening *en banc* or Supreme Court decisions." (citation omitted)).

[21] *Cf. Octane Fitness*, 572 U.S. at 555 ("[A] case presenting either subjective bad faith or exceptionally meritless claims may sufficiently set itself apart from mine-run cases to warrant a fee award.").

[22] *Cf. Baker*, 821 F.3d at 623–25 (noting that *Octane Fitness* rejected a bad-faith requirement and a "rigid standard of culpable conduct" in favor of a "flexible standard" focused on "the totality of the circumstances." (internal quotation marks and citations omitted)); *La Bamba Licensing, L.L.C. v. La Bamba Authentic Mexican Cuisine, Inc.*, 75 F.4th 607, 614 (6th Cir. 2023) ("We reject the plaintiff's invocation of a similar bright-line rule saying that fees could be awarded whenever a defendant's intentional infringement continued after the plaintiff sued. Such a rigid rule conflicts with the Supreme Court's more flexible totality-of-the circumstances approach to this inquiry." (cleaned up)); *Bayer CropScience AG v. Dow AgroSciences, L.L.C.*, 851 F.3d 1302, 1306 (Fed. Cir. 2017) ("[T]he Supreme Court adopted a holistic and equitable approach in which a district court may base its discretionary decision on other factors, including the litigant's unreasonableness in litigating the case, subjective bad faith, frivolousness, [and] motivation . . . .").

[23] ALO does not aver that attorney fees would have been warranted because of

The district court found that Axis litigated the case in an unreasonable manner by "notify[ing] the Court one week before trial that it changed the name of its store." That switch occurred even though Axis was "unwilling to change its name prior to litigation nor throughout the year and a half leading up to trial." Axis avers the switch was related to its store's relocating and had nothing to do with the litigation. Axis provides no evidence to support that contention. On the record before us, all the district court knew was that, without explanation, Axis stopped using the mark a week before trial. But the mere fact Axis that changed its name on the eve of trial does not mean it litigated the case in an unreasonable manner.

Courts have typically construed "unreasonable manner" in *Octane Fitness* as justifying a fee award where an adversary engages in some form of litigation misconduct such as abusing the discovery process,[24] filing frivolous pleadings or defenses,[25] dishonesty,[26] and the like. The district court did not find that Axis engaged in such behavior. But that does not end the analysis. As discussed above, *Octane Fitness* implied that a party's motivation can be relevant to whether they litigated the case in an unreasonable manner. 572 U.S. at 554 n.6. And "there is no precise rule or formula for making the determination" because whether a case is exceptional is a "case-by-case exercise" based on the "totality of the circumstances." *Id.* at 554 (cleaned

---

Axis's litigating positions.

[24] *See, e.g.*, *All. for Good Gov't*, 919 F.3d at 296–97 (refusing to postpone depositions); *Blackbird Tech L.L.C. v. Health in Motion, L.L.C.*, 944 F.3d 910, 917 (Fed. Cir. 2019) (unreasonable delay in document production).

[25] *See, e.g., All. for Good Gov't*, 919 F.3d at 296–97 (filing unsupported motions); *SRI Int'l, Inc. v. Cysco Sys., Inc.*, 14 F.4th 1323, 1332 (Fed. Cir. 2021) (maintaining nineteen theories of patent invalidity throughout the litigation and then presenting only two at trial).

[26] *See Amazon.com, Inc. v. PersonalWeb Techs., L.L.C. (In re PersonalWeb Techs., L.L.C.)*, 85 F.4th 1148, 1162 (Fed. Cir. 2023) (submitting inaccurate declarations).

No. 23-50413

up).

Therefore, when the district court evaluated whether Axis had litigated the case in an unreasonable manner, the law allowed the district court to look at Axis's motivations for litigating the case and for refusing to take its sign down earlier. But ALO has not shown any evidence of an improper motive.

The district court found this case exceptional because Axis "acted deliberately when it continued to use Plaintiff's mark after being notified of the potential issue" and "notified the Court one week before trial that it changed the name of its store" even though it was "unwilling to change its name prior to litigation [or] throughout the year and a half leading up to trial." So, the court based its fee award on Axis's (1) supposed willful infringement; (2) refusal to settle; and (3) last-minute change. But none of those three findings reaches the level necessary to show Axis had an improper motivation in litigating its case.

First, the district court did not make the necessary factual findings to support its conclusion that Axis's infringement was willful. Trademark infringement is willful "if it is done voluntarily and intentionally and with the specific intent to cause the likelihood of consumer confusion and with the intent to cause confusion, to cause mistake, or to deceive." *Quick Techs., Inc. v. The Sage Grp., PLC*, 313 F.3d 338, 349 n.9 (5th Cir. 2002) (internal quotation marks omitted). The infringer must have a "subjective belief that it was, in fact, guilty of trademark infringement." *Nat'l Bus. Forms & Printing, Inc. v. Ford Motor Co.*, 671 F.3d 526, 538 (5th Cir. 2012).

In explaining its fee award, the district court made no finding that Axis had a subjective belief that it was guilty of trademark infringement or that it

had acted with the specific intent to cause confusion.[27]  Instead, the court found only that Axis "acted deliberately when it continued to use [ALO's] mark after being notified of the potential issue" and was "unwilling to change its name prior to litigation nor throughout the" litigation. Other circuits have refused to find willful infringement in the context of § 1117 where a party refuses to change its mark after receiving a cease-and-desist letter or being made party to a lawsuit.[28]  That authority is persuasive.

Absent some additional evidence of wrongdoing, the mere fact that Axis refused to change its banner once ALO made it aware of its mark and filed suit against it cannot support a conclusion that Axis had a "subjective belief that it was, in fact, guilty of trademark infringement." *Nat'l Bus. Forms*, 671 F.3d at 538.  "An intent to confuse cannot be teased out of a business's decision to continue the challenged use after receiving a cease and desist letter," and a defendant's "good faith decision to stand on its view of its legal position should be no indication of evil intent or bad faith." 3 McCarthy § 23:120.  The district court abused its discretion in finding that Axis committed willful infringement without first finding explicitly that Axis had the subjective intent to cause confusion with ALO's mark.

---

[27] When assessing whether ALO's mark had secondary meaning, the district court appeared to find that Axis had intent to copy ALO's mark.  But the court did not rely on that finding when awarding attorney's fees.  In any event, whether someone has intent to copy the mark (relevant for secondary meaning) is distinct from whether that person copies the mark with the specific intent to infringe (relevant for willfulness). *Cf. Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 541, 555–56 (5th Cir. 1998) (treating the two inquiries as distinct).

[28] *See PlayNation Play Sys., Inc. v. Velex Corp.*, 924 F.3d 1159, 1170 (11th Cir. 2019) (rejecting a finding that the defendant "willfully infringed on [the] trademark based solely on [defendant's] continued sale . . . after it was served with [plaintiff's] complaint."); *Sands, Taylor & Woods Co. v. Quaker Oats Co.*, 978 F.2d 947, 962 (7th Cir. 1992) ("Even the defendant's refusal to cease using the mark upon demand is not necessarily indicative of bad faith.").

Second, Axis's refusal to settle cannot support the fee award. "[I]f a party is forced to make a settlement offer because of the threat of sanctions, and the offer is accepted, a settlement has been achieved through coercion. Such a result cannot be tolerated." *Dawson v. United States*, 68 F.3d 886, 897 (5th Cir. 1995) (citations omitted). If a court cannot use the threat of sanction to force a settlement offer, it follows that it may not impose sanctions on a party for failing to engage in settlement negations when that party has legitimate defenses to litigate. The district court abused its discretion in finding that Axis litigated this case in an unreasonable manner by refusing to settle.

Third, and finally, the fact that Axis changed its banner on the eve of trial cannot support the fee award because there was no evidence that Axis had an improper motivation for waiting that long to make the change. Sanctions may have been appropriate if there was evidence that Axis deliberately prolonged the litigation for no legitimate reason.[29] But ALO offered no such evidence. The record is silent as to why Axis changed its name and why it waited until the eve of trial to do so. Thus, in the absence of such evidence, the district court abused its discretion in finding that it was more likely than not that Axis had an improper motive in waiting until the last minute to remove its sign.

ALO avers that the district court was within its rights to consider Axis's willful infringement and refusal to settle as circumstantial evidence that Axis had an improper motivation in waiting until the eve of trial to change its banner. In this specific case, however, those two facts do not support an inference that Axis litigated its case with an improper motive. The district court did not make the findings needed to brand Axis a willful

---

[29] *See Octane Fitness*, 572 U.S. at 555 ("[A] case presenting either subjective bad faith or exceptionally meritless claims may sufficiently set itself apart from mine-run cases to warrant a fee award." (citation omitted)).

infringer, and our precedent prohibits that court from drawing adverse inferences against Axis for its refusal to settle.

Therefore, the district court abused its discretion in finding that Axis litigated the case in an unreasonable manner by refusing to take its banner down until the eve of trial where no evidence supported the inference that Axis's actions were done with an improper motive. So, none of the district court's articulated rationales support its finding that Axis litigated this case in an unreasonable manner, and the court abused its discretion in awarding ALO attorney's fees.[30]

\*   \*   \*   \*

For the reasons explained, we REVERSE the judgment as to the "Appliance Liquidation" mark and AFFIRM as to the "Appliance Liquidation Outlet" mark. Accordingly, we MODIFY parts one, two, and three of the injunction to remove reference to the "Appliance Liquidation" mark. We also MODIFY part four to read, "Causing confusion or the likelihood of confusion, mistake, or deception between Plaintiff and Defendant, including the confusing use of 'Appliance Liquidation.'" Finally, we VACATE the fee award.

---

[30] *Cf. Aransas Project v. Shaw*, 756 F.3d 801, 815 (5th Cir. 2014) (per curiam) ("A court abuses its discretion when its ruling is based on . . . a clearly erroneous assessment of the evidence." (citation omitted)).

HAYNES, *Circuit Judge*, concurring in part and dissenting in part:

I concur in much of the majority opinion. However, I would affirm the grant of attorney's fees as set forth in the district court's judgment and, therefore, I respectfully dissent from the reversal of the attorney's fees.

In arguing against attorney's fees, Axis relied upon case law that has since changed as a result of an intervening Supreme Court decision. The relevant and controlling case for purposes of the rule of orderliness is *Baker v. DeShong*, 821 F.3d 620 (5th Cir. 2016). As the ALO explains, Axis continued to use the confusing wording described in the majority opinion long after ALO explained the need to alter it. Yet, one week before the trial, Axis suddenly changed the name of its store and notified the court during the pretrial conference. At trial, counsel for Axis admitted that Axis changed the name of its store because of, what was then, the upcoming trial: "And now they've put the banner that says Appliance Surplus because they are still going to have bargain basement prices, but they did it to try to avoid having to pay me to come here today." The district court concluded that Axis was litigating in an unreasonable manner. Axis fails to cite a case that shows that Axis's conduct during the litigation and just before the trial was reasonable. As the district court explained:

> I'm left with the impression that your client has got this confusion going on for the purpose of we got these poor people out here who are coming to our place and then so once they find out that they have a problem with their appliance, we're not going to take care of them and we're going to buck them off on some other company. That's what I'm left with.

The court then awarded a very reasonable level of attorney's fees.

Although the majority opinion accurately notes that we review a decision on attorney's fees for an abuse of discretion, it wholly fails to follow that standard instead deciding the issue on its own. The district judge

interacted directly with the attorneys during the pretrial conference and heard the evidence directly during the bench trial on which the judge made the decisions. As the majority opinion explains, attorney's fees can be awarded if the "unsuccessful party has litigated the case in an 'unreasonable manner.'" Indeed, it correctly notes that our decision in *Spectrum Association Management, L.L.C. v. Lifetime HOA Management L.L.C.*, 5 F.4th 560 (5th Cir. 2021) fails to properly follow *Baker*. Of course, we must follow rule of orderliness and therefore follow *Baker*. The district court concluded that Axis litigated the case in an unreasonable manner given Axis's persistent refusal to change the name of its store until right before the trial and Axis's counsel even admitted that the name change was because of the upcoming trial. Respectfully, I do not understand why the majority opinion does not defer to the district court's determination of the facts and decision that this was an intentional act. That is a factual issue and that is what the district court concluded. Axis failed to show any record-based explanation for its sudden change, so the district court could properly conclude that Axis was making up its reasoning. Indeed, Axis's attorney admitted that its sudden change was because of the trial, which supports the district court's conclusion that Axis litigated the case in an unreasonable manner. We should defer to that and affirm it.

Accordingly, I respectfully dissent from that portion of the judgment.